# United States Court of Appeals

For the Eighth Circuit

_____

No. 18-2800

_____

United States of America,

*Plaintiff - Appellee*,

v.

Howard R. Ross, III,

*Defendant - Appellant.*

_____

No. 18-2877

_____

United States of America,

*Plaintiff - Appellee*,

v.

Raynal King,

*Defendant - Appellant.*

_____

Appeals from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: February 12, 2020
Filed: August 11, 2020
_____

Before SMITH, Chief Judge, COLLOTON and STRAS, Circuit Judges.
_____

COLLOTON, Circuit Judge.

Howard Ross and Raynal King were convicted on multiple federal charges arising from the carjacking, kidnapping, and murder of Jaime Patton on September 6, 2016. They appeal their convictions and sentences, and we affirm the judgments of the district court.[1]

I.

According to evidence at trial, in the early morning of September 6, King and Ross decided to commit a robbery because King needed money to make a car payment. In early September, King had communicated to Ross several times that he needed money, and Ross suggested committing a robbery. On September 4, Ross texted King: "Sup foo lets rob these Mexicans down here." Just before 4 a.m. on September 6, Ross asked King in a text message to meet him, and King responded that he was on his way. Data from a cellular tower showed that the men's cellular telephones were near each other in Kansas City, Missouri, at 5:49 a.m., and that King was attempting to contact Ross.

Meanwhile, Jaime Patton was at a hospital with his wife. She was about to give birth to their second child, although the reason for her hospitalization was not

_____

[1] The Honorable Greg Kays, United States District Judge for the Western District of Missouri.

disclosed at trial. Patton left the hospital to buy his wife a muffin and milk from a convenience store at about 5:50 a.m., and to stop by their apartment in Kansas City at 5:55 a.m. Shortly thereafter, Patton was abducted in his Jeep Patriot.

King drove the Jeep, with Patton as a front seat passenger, to two automatic teller machines in an effort to withdraw cash. Patton's bank records listed a failed debit card transaction at a Wells Fargo Bank ATM in Leawood, Kansas, at 6:05 a.m. The transaction failed because a wrong personal identification number was entered. Patton called his wife at 6:08 a.m. to ask whether she knew the PIN for their debit card.

Surveillance video from a Mazuma Credit Union in Kansas City, Missouri, shows that King pulled the vehicle up to an ATM, while Patton sat in the front passenger seat with his arms in front of him and his palms on the dashboard. The video also shows a passenger in the back seat behind the driver. King got out of the car and attempted to use Patton's debit card to make a withdrawal. Patton's financial records show two failed transactions at the Mazuma ATM at 6:12 a.m. and 6:14 a.m.

At approximately 6:30 a.m., a 911 caller reported finding Patton on the side of Holmes Road in Kansas City, Missouri. Patton was breathing but unresponsive. He had suffered multiple gunshot wounds. By the time emergency services arrived, Patton had died. Surveillance video from a local business showed a vehicle consistent with the appearance of Patton's Jeep traveling down Holmes Road at about 6:30 a.m.

At 7:05 a.m., King entered a 7-Eleven store near 89th Street and Wornall Road, in Kansas City and attempted to use Patton's debit card three more times at an ATM. All three transactions failed. Surveillance video from the 7-Eleven shows King driving up in his Silver Grand Prix automobile and a man wearing a bright blue or green sweatshirt in the passenger seat.

King and Ross then went to the apartment of King's girlfriend, Tonesha Sanders. Sanders testified that Ross, whom she knew as "Shooter" or "Lil' Howard," possessed a gun, had a splash of blood on his pants, and was wearing a blue or green hoodie. Sanders testified that the two men discussed having shot a man that morning, that King was worried about whether the man had died, and that Ross said he shot the man because he wanted that "MFer" to know "he wasn't playing." Sanders said that King denied shooting the man.

Sanders accompanied the men to a store where King tried to sell an iPhone that Ross handed to him in the car. The government infers that it was a phone stolen from Patton. When they returned to Sanders's apartment, Sanders saw Patton's Jeep parked across the street, and she told the men to move the vehicle away from her apartment. Sanders later picked up King after he moved the Jeep.

Police investigating Patton's death identified King after tracing Patton's bank records and viewing the surveillance videos from the 7-Eleven store. In an interview on September 8, King initially denied involvement in the crimes against Patton. But when officers confronted him with surveillance video from the Mazuma Credit Union, King admitted that he was involved. King claimed, however, that another man, whom he refused to name, had forced him to participate in the crimes.

While police interviewed King, other officers searched Sanders's apartment and King's car. Police found the keys to Patton's Jeep and Patton's debit card in the apartment, and located other personal items belonging to Patton in King's car.

Police also interviewed Ross after Sanders identified him as the person with King on September 6. Ross denied knowing King and denied riding in a Jeep Patriot. On Ross's iPhone, police found photos, taken a few weeks earlier, of Ross holding a Springfield XDS .45 caliber pistol. Ballistics analysis of the casings found in the

Jeep and near Patton's body were consistent with bullets fired from that type of weapon.

A grand jury charged Ross and King with six offenses relating to the kidnapping, carjacking, and murder of Jaime Patton: (1) conspiracy to commit kidnapping, *see* 18 U.S.C. § 1201(a)(1), (c); (2) aiding and abetting kidnapping resulting in death, *see* 18 U.S.C. §§ 1201(a)(1) and 2; (3) using a firearm in furtherance of kidnapping resulting in felony murder, *see* 18 U.S.C. §§ 924(c), 924(j)(1), and 2; (4) carjacking resulting in death, *see* 18 U.S.C. §§ 2119(3) and 2; (5) using a firearm in furtherance of a carjacking resulting in felony murder, *see* 18 U.S.C. §§ 924(c), 924(j)(1), and 2; and (6) aiding and abetting each other in the unlawful possession of a firearm as a previously convicted felon, *see* 18 U.S.C. §§ 922(g)(1), 924(a)(2), and 2. After a five-day trial, a jury convicted both men on all counts.

The district court sentenced Ross and King to life terms of imprisonment on counts one, two, and four, to run concurrently with a 120-month sentence on count six. The court also imposed consecutive life sentences on counts three and five. Ross and King appeal their convictions and sentences on several grounds.

II.

Ross and King argue they are actually innocent on counts three and five—using a firearm in furtherance of kidnapping and carjacking, respectively, that resulted in felony murder—because neither kidnapping nor carjacking is a "crime of violence" as defined by 18 U.S.C. § 924(c). The offense of conviction, 18 U.S.C. § 924(j), requires proof that the defendant caused a death in the course of a violation of § 924(c):

-5-

(j) A person who, *in the course of a violation of subsection (c)*, causes the death of a person through the use of a firearm, shall—(1) if the killing is a murder (as defined in section 1111), be punished by death or by imprisonment for any term of years or for life . . . .

18 U.S.C. § 924(j) (emphasis added).

Subsection (c) encompasses "any person who, during and in relation to any crime of violence . . . uses or carries a firearm." As relevant here, § 924(c)(3)(A) defines a "crime of violence" as an offense that is a felony and "has as an element the use, attempted use, or threatened use of physical force against the person or property of another." The government maintains that both kidnapping resulting in death and carjacking resulting in death are crimes of violence under this "force clause."

In determining whether an offense is a crime of violence under § 924(c), we apply a categorical approach. We consider the elements of the offense and examine whether they necessarily require the use, attempted use, or threatened use of physical force. *United States v. Harper*, 869 F.3d 624, 625 (8th Cir. 2017). "If a statute covers more conduct than the definition of 'crime of violence,' and 'comprises multiple, alternative versions of the crime,' then we may apply a 'modified categorical approach' to determine which alternative was the offense of conviction." *Id.* (quoting *Descamps v. United States*, 570 U.S. 254, 261-62 (2013)). A statute that sets forth alternative crimes is "divisible," and "the court may 'consult a limited class of judicial records to determine under which alternative the defendant was convicted.'" *Id.* (quoting *United States v. Hudson*, 851 F.3d 807, 809 (8th Cir. 2017)).

We address first the conviction under count three for use of a firearm in furtherance of a kidnapping resulting in death as charged in count two. Kidnapping is an offense under 18 U.S.C. § 1201(a):

Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person . . . shall be punished by imprisonment for any term of years or for life and, if the death of any person results, shall be punished by death or life imprisonment.

The statute defines at least two alternative crimes: (1) kidnapping and (2) kidnapping resulting in death. The latter requires proof of an additional element (*i.e.*, that the death of any person results) and carries a greater punishment ("death or life imprisonment"). Where the statutory alternatives carry different punishments, they must be elements of different offenses, not means to commit a single offense. *Mathis v. United States*, 136 S. Ct. 2243, 2256 (2016).

The judicial record shows that King and Ross were convicted of the more serious offense of kidnapping resulting in death, and of using a firearm during and in relation to that offense. The indictment charged in count two that King and Ross, "aiding and abetting each other, did unlawfully seize, confine, kidnap, abduct, and carry away, and otherwise attempt to rob victim, J.P., . . . and such conduct did result in the death of J.P." Count three charged that the defendants used a firearm during and in relation to the kidnapping resulting in death as alleged in count two. The final jury instructions on kidnapping in count two required the government to prove as an element that "Jaime Patton's death resulted from the kidnapping." The defendants, therefore, necessarily were convicted of kidnapping resulting in death under count two, and the conviction under count three was premised on a finding that they used a firearm "during and in relation to the kidnapping to cause the death of Jaime Patton" as charged in count two.

Ross and King argue that they are actually innocent of using a firearm to commit felony murder under count three because kidnapping does not necessarily involve the use, attempted use, or threatened use of force. They suggest that a kidnapper who "inveigles" or "decoys" a victim may commit the offense without

using force.  Therefore, they contend, kidnapping does not qualify as a crime of violence under § 924(c), so there could be no violation of § 924(j).

Whatever the merit of that contention as to kidnapping without a death, it fails as applied to the offense of kidnapping resulting in death.  "Force" means "force capable of causing physical pain or injury to another person."  *Johnson v. United States*, 559 U.S. 133, 140 (2010).  "[I]t is impossible to cause bodily injury without using force 'capable of' producing that result," *United States v. Castleman*, 572 U.S. 157, 174 (2014) (Scalia, J., concurring in part and concurring in the judgment), so an offense requiring proof of physical injury is an offense that has as an element the use of physical force.  *United States v. Winston*, 845 F.3d 876, 878 (8th Cir. 2017).  *A fortiori*, an offense that requires proof that the defendant caused death has as an element the use of force.  *See United States v. Peeples*, 879 F.3d 282, 287 (8th Cir. 2018).

Ross and King respond that a defendant could be convicted under § 1201(a) based on a natural death that occurs coincidentally in the course of a kidnapping, and that a coincidental death need not involve the use of force.  We reject this contention because the kidnapping statute requires a causal relationship between the kidnapping and the death.  The statute proscribes kidnapping "if the death of any person *results*," 18 U.S.C. § 1201(a) (emphasis added), and "results" means that the kidnapping is a but-for cause of the death.  *See Burrage v. United States*, 571 U.S. 204, 210-11 (2014).  "A thing 'results' when it '[a]rise[s] as an effect, issue, or outcome *from* some action, process or design.'"  *Id*. at 211 (quoting 2 *The New Shorter Oxford English Dictionary* 2570 (1993)).  Like felony murder at common law, § 1201(a) requires a "temporal and *causal connection* between the death and the felony."  *United States v. Montgomery*, 635 F.3d 1074, 1087 (8th Cir. 2011) (emphasis added).

Ross and King also argue that a kidnapper might cause a death inadvertently or negligently, and that a mental state greater than negligence is required to satisfy

the force clause. They posit a kidnap victim who "panics" and jumps out of a car to her death while the vehicle is speeding down a highway. *See United States v. Melton*, 883 F.2d 336, 337 (5th Cir. 1989). They also cite *Leocal v. Ashcroft*, 543 U.S. 1 (2004), where the Court held that an offense of driving under the influence of alcohol and causing serious bodily injury did not require the "use" of physical force. *Leocal* reasoned that the ordinary meaning of "use of physical force" most naturally suggests a higher degree of intent than negligent or merely accidental conduct, but a drunk driver could be convicted for negligently operating the motor vehicle. *Id*. at 9. Ross and King maintain that if a kidnapper accidentally or negligently causes the death of his victim, then he too does not "use" force within the meaning of § 924(c).

The proposed analogy between a kidnapper causing death and a drunk driver causing bodily injury is inapt. The kidnapping statute requires an intentional scienter—that is, proof that the defendant unlawfully seized or confined and held a victim, with a willful intent to confine the victim, and then willfully transported him. *See Chatwin v. United States*, 326 U.S. 455, 460 (1946); *United States v. Corbett*, 750 F.3d 245, 249 (2d Cir. 2014); *United States v. Osborne*, 68 F.3d 94, 100 (5th Cir. 1995).

Although § 1201(a) includes no separate *mens rea* element for a death that results from kidnapping, the use of force is still a necessary element of the crime. The offense of kidnapping resulting in death under § 1201(a) is akin to common-law felony murder. *See Montgomery*, 635 F.3d at 1087. At common law, "intent to kill and intent to commit a felony were alternative aspects of the single concept of 'malice aforethought.'" *Schad v. Arizona*, 501 U.S. 624, 640 (1991) (plurality opinion). A defendant who intentionally kidnaps a victim thus acts with "malice aforethought" in causing the victim's death. *See Allen v. United States*, 247 F.3d 741, 783-84 (8th Cir. 2001). Reckless disregard for human life is inherent in the commission of felonies such as robbery and kidnapping that carry a grave risk of death. *See Tison v. Arizona*, 481 U.S. 137, 157-58 (1987); *United States v. Jackson*, 736 F.3d 953, 959

(10th Cir. 2013). Put differently, intentional kidnapping necessarily involves "a deliberate decision to endanger another" that amounts to recklessness. *See Voisine v. United States*, 136 S. Ct. 2272, 2279 (2016).

Where a perpetrator intentionally kidnaps a victim, and the kidnapping results in the victim's death, the perpetrator's mental state is sufficient to show that he necessarily "used" force against the victim. The offense requires a "higher degree of intent than negligent or merely accidental conduct." *Leocal*, 543 U.S. at 9. Because the offense of kidnapping resulting in death has as an element the use of force, it is a crime of violence under § 924(c). Ross and King were thus properly convicted under § 924(j) of causing death through use of a firearm in the course of committing a crime of violence.

The dissent's assertion to the contrary relies on a pair of hypotheticals that do not prove the point. *Post*, at 20-21. If a kidnapper inveigles a victim into his car and then causes her death by recklessly crashing the vehicle or prompting the victim to flee from the speeding car, the kidnapper's offense involves the use of force against the victim. Force is necessary to kill the victim when she slams into the windshield or the pavement. The application of force is not an accident: when the perpetrator intentionally deceives and kidnaps the victim, he makes a deliberate decision to endanger her and acts with reckless disregard for her safety. Recklessness is a sufficient *mens rea* for application of the force clause. *United States v. Fogg*, 836 F.3d 951, 956 (8th Cir. 2016). Although this circuit's unique jurisprudence thus far has maintained that "unadorned reckless driving causing injury" is an exception to that rule, *United States v. Fields*, 863 F.3d 1012, 1015 (8th Cir. 2017); *see United States v. Schneider*, 905 F.3d 1088, 1092 (8th Cir.), *reh'g en banc denied by equally divided vote*, 911 F.3d 504 (8th Cir. 2018), kidnapping resulting in death is not an "unadorned" driving offense. *Cf. United States v. Ossana*, 638 F.3d 895, 901 n.6 (8th Cir. 2011).

-10-

Use of force does not require bodily contact between the perpetrator and the victim. The force clause encompasses acts that are not themselves violent but cause bodily injury indirectly. *Castleman*, 572 U.S. at 170; *Peeples*, 879 F.3d at 287; *United States v. Rice*, 813 F.3d 704, 706 (8th Cir. 2016); *see United States v. Reyes-Contreras*, 910 F.3d 169, 181-183 & n.23 (5th Cir. 2018) (en banc) (collecting cases); *United States v. Reid*, 861 F.3d 523, 526-28 (4th Cir. 2017). Dropping a slippery plate from soapy hands after losing a grip does not count as using force when it causes injury, because the act is not volitional. *Voisine*, 136 S. Ct. at 2279. But recklessly throwing a plate against a wall, *id.*, recklessly pulling the trigger on a gun, *Castleman*, 572 U.S. at 171; *Fogg*, 836 F.3d at 956, sprinkling poison in a drink, *Castleman*, 572 U.S. at 171; *Rice*, 813 F.3d at 706, and withholding food to cause starvation, *Peeples*, 879 F.3d at 286-87, all constitute the use of force against another when injury results indirectly. So too, intentionally hauling away a kidnap victim with reckless disregard for the deadly consequences is a volitional act that necessarily involves the use of force when the kidnapping results in death by car crash or escape attempt.

The dissent's insistence that a perpetrator uses force only if he engages in a "forceful act," *post*, at 21 n.3, runs counter to *Castleman* and this court's decisions holding that the use of physical force includes the application of force by indirect means. When, as in the hypothetical kidnappings, a perpetrator's intentional or reckless conduct causes the indirect application of violent force against a victim, the perpetrator necessarily uses physical force against the victim. Faithful application of the categorical approach thus shows that Ross and King committed a crime of violence when they caused Jaime Patton's death through use of a firearm in the course of a kidnapping that resulted in death.

Ross and King raise a comparable argument as to count five, which charged use of a firearm in furtherance of a carjacking that resulted in death. Carjacking resulting in death requires proof that a defendant, "with the intent to cause death or

-11-

serious bodily harm," takes a motor vehicle "by force and violence or by intimidation," and "death results." 18 U.S.C. § 2119(3). Ross and King nonetheless contend that carjacking does not satisfy the force clause, because the element of "intimidation" does not necessarily imply a threatened use of force. Even without considering the element that "death results," this argument is foreclosed by *Estell v. United States*, 924 F.3d 1291, 1293 (8th Cir.), *cert. denied*, 140 S. Ct. 490 (2019), which held that carjacking without a death necessarily involves at least the threatened use of force. Accordingly, a violation of § 2119 constitutes a "crime of violence" under § 924(c), and the defendants were properly convicted under § 924(j) of causing death through use of a firearm in the course of a carjacking.

III.

Ross challenges his convictions on several other grounds. First, he contends that there is insufficient evidence to support the convictions. Viewing the evidence in the light most favorable to the verdict, we consider whether a rational jury could find the defendant guilty beyond a reasonable doubt. *United States v. Wiest*, 596 F.3d 906, 910 (8th Cir. 2010); *see Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

To establish a violation of the federal kidnapping statute, the government must prove that the victim was "willfully transported in interstate or foreign commerce." 18 U.S.C. § 1201(a)(1). Ross argues that there is no evidence that he was in the car when King drove Patton across the state line between Missouri and Kansas. Therefore, Ross contends, no reasonable jury could find that he willfully transported Patton in interstate commerce or agreed to do so. As such, he seeks a judgment of acquittal on conspiracy to commit kidnapping, aiding and abetting kidnapping, and using a firearm in furtherance of a kidnapping resulting in felony murder.

Proof that a kidnapping victim was transported across a state line is necessary only to establish a basis for the exercise of federal jurisdiction. It is not a substantive

element of the kidnapping offense. *United States v. Welch*, 10 F.3d 573, 574 (8th Cir. 1993) (per curiam). The government, therefore, need prove only the fact that a victim was transported in interstate commerce. The prosecution is not required to prove that a conspirator agreed to cross a state line or that an aider or abetter knew that the victim was moved in interstate commerce. *United States v. Bankston*, 603 F.2d 528, 532 (5th Cir. 1979). Ross does not dispute that the victim here was moved from the point of abduction in Missouri to a bank in Kansas and back to a credit union in Missouri, so the jurisdictional element is satisfied.

In any event, there is ample evidence that Ross was in the Jeep when the conspirators transported Patton across the Missouri-Kansas line. Patton was abducted near his home in Missouri. Bank records show attempted withdrawals at the Wells Fargo Bank in Kansas and the Mazuma Credit Union in Missouri. Still images from the Mazuma ATM surveillance camera show a passenger in the back seat behind King while Patton is in the front passenger seat. There are text messages between King and Ross two days before the abduction in which Ross proposes to commit a robbery. Other messages show that King agreed to meet Ross only a few hours before the crimes against Patton. Cellular tower data show that Ross and King were close to each other immediately before Patton was abducted. Sanders testified that Ross admitted to participating in the shooting and was wearing clothing that matched the apparel of King's companion at the 7-Eleven after the shooting. It would have been reasonable to infer that Ross was in the Jeep throughout the episode as the kidnappers transported the victim between Missouri and Kansas.

There was also sufficient evidence to convict Ross on counts four and five for carjacking resulting in death and using a firearm in furtherance of a carjacking resulting in felony murder. The evidence detailed above supported a finding that Ross participated in the carjacking and kidnapping. Sanders's testimony that Ross admitted to shooting Patton further bolstered a finding that Ross used a firearm in furtherance of a carjacking that resulted in Patton's death.

-13-

There is likewise sufficient evidence to sustain Ross's conviction on count six for unlawful possession of a firearm as a previously convicted felon. Ross says the evidence is insufficient because the police never found a firearm in his possession and no person verified that the gun depicted in photos on his iPhone was a functioning firearm. But lay testimony can be sufficient to support a finding that an object is a firearm, even without a firearm in evidence or expert testimony. *United States v. Dobbs*, 449 F.3d 904, 911 (8th Cir. 2006). Sanders testified that Ross had a gun at her apartment on the morning of the kidnapping and murder, and that he admitted to shooting the victim. This testimony, combined with photos showing Ross in possession of what appeared to be a gun, is sufficient to support a reasonable finding that Ross possessed a firearm.

Ross next raises an evidentiary argument that the district court abused its discretion by admitting the September 4 text message from Ross to King. Ross claims that the message—"Sup foo lets rob these Mexicans down here"—was evidence of a prior bad act that should have been excluded as improper character evidence under Federal Rule of Evidence 404(b).

The district court admitted the text message as evidence that was relevant to prove the charged conspiracies to commit carjacking and kidnapping. Evidence that is inextricably intertwined with a charged offense or that provides context for a charged offense is admissible as relevant under Rule 401. It is not governed by Rule 404(b). *United States v. Young*, 753 F.3d 757, 770 (8th Cir. 2014).

The disputed text message was relevant to prove an agreement between Ross and King to commit the charged offenses. Ross complains that the text message discussed robbing "Mexicans," while Patton was not Mexican, but the identity of the victim does not make the message irrelevant to the charged offenses. That the conspirators, only two days earlier, discussed committing a robbery tended to make it more probable that they agreed to carjack Patton's vehicle and to kidnap Patton.

-14-

The evidence suggested that the motive for robbery was pecuniary gain, so it was reasonable to infer that the identity of the victim was not central to the conspiracies: a proposal to rob "Mexicans" easily could have evolved into a plan to rob Patton. The court permissibly admitted the message as evidence of the charged offenses.

Ross also challenges the district court's refusal to give a requested jury instruction about eyewitness testimony. We review the instructions to determine whether, taken as a whole, they fairly and adequately submitted the issues to the jury. *United States v. Meads*, 479 F.3d 598, 601 (8th Cir. 2007).

The court gave a general instruction on witness credibility, explaining that the jury could believe all, some, or none of any witness's testimony. On the issue of credibility, the instruction directed the jury to consider

> the witness's intelligence, the opportunity the witness had to have seen or heard the things testified about, the witness's memory, any motives that witness may have for testifying a certain way, the manner of the witness while testifying, whether that witness said something different at an earlier time, the general reasonableness of the testimony, and the extent to which the testimony is consistent with other evidence that you believe.

Citing Sanders's testimony that Ross accompanied King to her apartment on the day of the crimes, Ross requested an additional instruction about the evaluation of "identification testimony."[2] Sanders viewed two photographs to help police

---

[2]The proposed instruction read as follows:

The value of identification testimony depends on the opportunity the witness had to observe the offender at the time of the offense and to make a reliable identification later.

determine the identity of King's companion, and she selected a photograph of Ross. Ross argued at trial that Sanders identified him from a photograph rather than from a lineup, so a cautionary instruction about identification testimony was warranted. The government countered that Sanders was familiar with Ross from a prior occasion and was not attempting to identify a person whom she saw for the first time during the commission of an offense. The court declined to give the instruction.

We conclude that the district court did not abuse its discretion. The proposed instruction referred to "the opportunity the witness had to observe the offender at the time of the offense," but Sanders did not witness a perpetrator committing a crime and then attempt to identify him later. She encountered Ross and King after they committed offenses against Patton. Sanders knew Ross, but did not know his real name, so she viewed photographs of known persons in order to match the face with a name. The jury was instructed more generally on factors relevant to judging Sanders's credibility, and Ross was free to argue that she was not credible or that she identified the wrong person. The instructions were sufficient on this point.

IV.

King challenges the district court's refusal to give his proposed instruction on the defense of duress. King claims that he participated in the crimes only because another man (presumably Ross) threatened him, and that he was entitled to a jury

---

In evaluating such testimony you should consider all of the factors mentioned in these instructions concerning your assessment of the credibility of any witness, and you should also consider, in particular, whether the witness had an adequate opportunity to observe the person in question at the time of the offense. You may consider, in that regard, such matters as the length of time the witness had to observe the person in question, the prevailing conditions at the time in terms of visibility or distance and the like, and whether the witness had known or observed the person at earlier times.

instruction on the issue. The district court ruled that King's evidence fell short on the elements of the defense, and thus declined to give the instruction.

In his interview with police, which was received as evidence at trial, King first said that a man approached him near a gas station, then changed to say that the encounter occurred at King's house. The man allegedly was driving Patton's Jeep, with Patton in the car, while King was sitting on his front porch. King claimed that the man had a gun, opened his car door, told King that "I need your help, get in," and beckoned King to get in the car and drive. According to King, the man sat in the driver's seat and held the gun facing the open car door, so when King approached and stood between the man and the door, the barrel was facing King. King said that he agreed to drive only because he was afraid that he would "take that bullet" if he refused.

To establish duress or coercion, a defendant must show that (1) he was under an unlawful and present, imminent, and impending threat of such a nature as to induce a well-grounded apprehension of death or serious bodily injury, (2) that he had not recklessly or negligently placed himself in a situation in which it was probable that he would be forced to commit a criminal act, (3) that he had no reasonable, legal alternative to violating the law, and (4) that a direct causal relationship may be reasonably anticipated between the commission of the criminal act and the avoidance of the threatened harm. *United States v. Jankowski*, 194 F.3d 878, 883 (8th Cir. 1999). The defense bears the burden to prove the existence of duress by a preponderance of the evidence. *United States v. Myles*, 962 F.3d 384, 388 (8th Cir. 2020). A district court properly refuses an instruction on duress if the evidence taken in the light most favorable to the defendant would not support a finding of duress. *Id.*; *United States v. Green*, 835 F.3d 844, 855 (8th Cir. 2016).

King did not meet his burden. There was insufficient evidence to show that King was under a "present, imminent, and impending threat" of death or serious

bodily injury. King offered shifting explanations in his interview, but eventually claimed that he entered the Jeep after an unidentified man arrived at his apartment with a gun and said that he needed help. Although King said that the barrel of the gun was "facing" him after he walked between the man and the car door, King never claimed that the man threatened him or said more than "I need your help." To excuse participation in a kidnapping and felony murder on account of duress, a defendant must present stronger evidence that he attempted to avoid participation and faced a true imminent threat of death or serious injury that compelled him to assist. The prosecution presented substantial evidence that King actually participated in planning the crimes. But even accepting the most exculpatory version of King's statements to police, it was insufficient to establish an imminent threat that would require a jury instruction on duress.

At least with respect to the kidnapping conspiracy, King also failed to present sufficient evidence that he had no reasonable, legal alternative to participating in the offenses. After Patton was shot, King entered a convenience store by himself while his companion waited in the car. He also entered another shop while Ross and Sanders waited outside in a car. Although Patton by then had been left on the side of the road, the conspiracy continued: robbery was an object of the agreement, and King was still attempting to derive funds from Patton's bank account or property. *See McDonald v. United States*, 89 F.2d 128, 135-36 (8th Cir. 1937). Yet King made no attempt to escape or to alert authorities when he had opportunities to do so. The district court properly declined to give the jury instruction on duress.

V.

Ross and King also challenge their sentences on appeal. They argue that the combined mandatory minimum sentences on counts two, three, and five violate the Eighth Amendment. They contend that the requirement of 18 U.S.C. § 924(c)(1)(D)

that a life sentence for using a firearm must run consecutive to mandatory life terms for other offenses resulted in a sentence that is grossly disproportionate to the crime.

The Eighth Amendment does not require strict proportionality between crime and sentence, but rather "forbids only extreme sentences that are grossly disproportionate to the crime." *Wiest*, 596 F.3d at 911 (quoting *Harmelin v. Michigan*, 501 U.S. 957, 1001 (Kennedy, J., concurring in part and concurring in the judgment)). The question is whether "the gravity of the crime, considering the harm caused or threatened to the victim or to society, and the culpability and degree of the defendant's involvement, lead to an inference of gross disproportionality." *United States v. Scott*, 831 F.3d 1027, 1034 (8th Cir. 2016) (internal quotation marks omitted). The crimes against Patton were of the utmost gravity. A life sentence was not grossly disproportionate. Insofar as a life sentence under § 924(c) that is consecutive to another life sentence has any practical effect, it does not violate the Eighth Amendment under these circumstances.

King also contends that his sentence is substantively unreasonable because he was less culpable than Ross but received the same sentence. We review the substantive reasonableness of a sentence under a deferential abuse-of-discretion standard. *Gall v. United States*, 552 U.S. 38, 41 (2007). In sentencing King, the district court remarked that the offenses were "terrible and despicable, a real tragedy," concluded that deterrence was "an important factor" in the case, and declared that the need to protect the public from further crimes was "the number one factor that weighs the strongest in this case." The court remarked that anyone who sat through the trial was reminded that "there are predators among us," and that Jaime Patton was victimized and killed while simply going about his day.

The court acknowledged that Ross and King had "different roles," but found that the offenses were "part of one criminal enterprise" and the result of a "decision made by both of them to do this terrible act." On that basis, the court determined that

-19-

they should "both be held accountable in the same way." Although King may not have fired the shot that killed Patton, he was convicted of felony murder and of participating in a kidnapping and a carjacking that led to the death. It was not unreasonable for the district court to impose terms of life imprisonment for such egregious offenses.

\* \* \*

The judgments of the district court are affirmed.

STRAS, Circuit Judge, concurring in the judgment in part and dissenting in part.

Shooting someone multiple times in the course of a kidnapping sure sounds like a "crime of violence." 18 U.S.C. § 924(c)(1)(A); *accord Johnson v. United States*, 135 S. Ct. 2551, 2581 (2015) (Alito, J., dissenting) (discussing "violent felon[ies]"). And were our task to examine the actual facts of *this* crime, no other conclusion would be possible. But our task is different: we must determine whether a kidnapping resulting in death *necessarily* requires the "use . . . of physical force." 18 U.S.C. § 924(c)(3)(A); *Descamps v. United States*, 570 U.S. 254, 261 (2013); *see Mathis v. United States*, 136 S. Ct. 2243, 2248 (2016) ("Facts" have "no legal effect or consequence" and "ACCA, as we have always understood it, cares not a whit about them." (internal quotation marks and citations omitted)).

Under what has come to be known as the "categorical approach," I would conclude that it does not. Consider a different set of facts. Suppose that an individual gets in a car with a person impersonating an Uber driver and dies, either in a tragic car accident caused by the driver's recklessness or by jumping out after discovering the driver's true identity. *See United States v. Melton*, 883 F.2d 336, 337 (5th Cir. 1989) (claiming to be an "off-duty cab driver" and kidnapping a passenger who allegedly "panicked[,] jumped out of [the] car," and died); *see also United States*

-20-

*v. Schneider*, 905 F.3d 1088, 1092 (8th Cir. 2018) (concluding that a statute criminalizing reckless driving that "causes serious bodily injury" is not a crime of violence). Both scenarios qualify as kidnapping by "inveigle[ment]" or "decoy[]," and each "results" in death. 18 U.S.C. § 1201(a). And critically, *neither* involves the use of force.[3] *See Voisine v. United States*, 136 S. Ct. 2272, 2278–79 (2016) (stating that "use" of force requires that force "be volitional"); *Schneider*, 905 F.3d at 1092. For that reason, and notwithstanding the court's abstract reasoning to the contrary, I respectfully dissent.[4]

_____

[3]The court's definition of "use of force" amounts to an endangerment-like standard, which really just imports the language from a separate definition of "crime of violence"—one that the Supreme Court recently declared unconstitutional. *See* 18 U.S.C. § 924(c)(3)(B) (defining a "crime of violence" as an offense "that, by its nature, involves *a substantial risk* that physical force against the person or property of another may be used in the course of committing the offense" (emphasis added)), *held unconstitutional in United States v. Davis*, 139 S. Ct. 2319, 2336 (2019). Once there has been a "a deliberate decision to endanger" a victim, the court tells us, the act of kidnapping "necessarily involves the use of force," even if the means employed is "inveigle[ment]" or "decoy." *Ante* at 10-11. But "inveigle[ment]" and "decoy" are not themselves forceful acts, and nowhere does the court identify any other possible use of force, direct or indirect, by the *perpetrator* in either scenario. With the substantial-risk definition of "crime of violence" now off the table, *see* 18 U.S.C. § 924(c)(3)(B), this means that kidnapping, even one resulting in death, no longer qualifies.

[4]The remaining challenges in this case have no merit, so I otherwise concur in the judgment.

-21-