# United States Court of Appeals

### For the Eighth Circuit

_____

No. 20-1427

_____

United States of America

*Plaintiff - Appellee*

v.

Dajuan Sharron

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Nebraska - Omaha

_____

Submitted: November 20, 2020
Filed: January 21, 2021

_____

Before BENTON, ERICKSON, and GRASZ, Circuit Judges.

_____

ERICKSON, Circuit Judge.

Dajuan Sharron was convicted by a jury of robbing an individual of personal property belonging to the United States, in violation of 18 U.S.C. § 2112. The district

court[1] sentenced Sharron to a term of 96 months' imprisonment to be followed by three years of supervision and ordered restitution in the amount of $1,500. Sharron appeals, contending the court erred when it refused to instruct the jury on duress or coercion and/or voluntariness and when it limited his ability to present his theory of defense during closing argument. We affirm.

## I.    BACKGROUND

In May 2018, a special agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") began working with a confidential informant ("CI") to purchase firearms and narcotics in Omaha, Nebraska, from individuals within a gang. On August 7, 2018, the CI arranged to purchase three firearms from Kan Tap ("Tap") and Loing Yar ("Yar") for $1,500. ATF provided the CI with a vehicle equipped with audio and video recordings devices to document the transaction.

The CI parked the undercover ATF vehicle at the agreed upon meeting location. When Tap and Yar arrived in their vehicle, they parked next to the CI, and got into the CI's vehicle. Tap and Yar informed the CI that they did not have the firearms so they would have to drive to an apartment to get them from another person. The CI took Tap and Yar to an apartment complex. Tap and Yar went inside the complex and quickly returned, informing the CI that the individual was not there and they would have to return later to get the guns. The CI drove Tap and Yar back to their car and they parted ways.

Sharron testified that although he did not know the CI, he had engaged in previous drug transactions with Yar, including one the night before the robbery at issue here during which Yar fronted Sharron $40–$60 worth of methamphetamine.

---

[1]The Honorable Robert F. Rossiter, Jr., United States District Judge for the District of Nebraska.

A video found on Yar's cell phone showed Tap and Yar stopping Sharron and demanding money from Sharron for the fronted methamphetamine. When Sharron told Tap and Yar that he did not have the money, Yar attempted to strike Sharron. Tap and Yar then took Sharron's cigarettes and left in their car. This encounter lasted approximately two minutes and Sharron testified that afterwards he continued walking down the street even though he feared for his life because he believed Tap and Yar were carrying a firearm. Sharron told the jury that he did not ask for help and did not call police because Yar knew where he lived.

Sharron testified that approximately 45 minutes after this encounter with Tap and Yar, he was standing outside the Park Avenue Towers in Omaha, Nebraska, talking to an associate who lived there when Tap and Yar started hollering at him again and pulled over in their car. Even though Sharron claimed to be in fear for his safety because of Yar's conduct less than an hour earlier, Sharron testified he remained in public because he did not think Tap and Yar would come looking for him again so soon. At Yar's request, Sharron followed Yar to an area in the park across from the Towers. Once at the end of the park trail, Sharron testified that Yar repeatedly directed him to sit down. Yar demanded Sharron repay his debt. After Sharron told Yar he would pay him later, Yar made a phone call. Sharron heard Yar say, "I'm on my way, get ready, be ready." Sharron did not know who Yar was talking to, but when Yar hung up, Yar told Sharron that he "wanted [him] to do something and he ain't taking no for an answer." According to Sharron, Yar told him that if he did not follow his directions, Yar would shoot him. While Sharron did not see a firearm, he believed Tap or Yar was carrying a firearm because "[i]t's a fact" that "between the both of them . . . they keep one."

Meanwhile, Tap or Yar had communicated with the CI and told the CI they now had the firearms and were ready to move forward with the sale. The CI, along with law enforcement conducting surveillance, returned to the same designated meeting site and waited for Tap and Yar to arrive. Several blocks away, Sharron got

into the backseat of Tap and Yar's vehicle and Tap began driving. Yar told Sharron "there [was] going to be a guy and he wanted [Sharron] to take the money" and to "play it off like [Sharron was] robbing everybody" and to "take everybody's cell phone." After the robbery, Sharron was to meet Tap and Yar at a store approximately six or seven blocks from the robbery location.

When Tap stopped the vehicle about 50 feet from the meeting location, Sharron got out of the car and watched where Tap and Yar went by "peek[ing] around the corner." Once Tap and Yar were ensconced inside the car with the CI, Sharron, carrying a black bag, walked up to the vehicle, got in, and sat next to Tap in the backseat. Sharron concealed his hand in the black bag, mimicked having a firearm, demanded money from the CI, and ordered only Tap and Yar to give him their cell phones. Sharron threatened to shoot the CI if he did not give him money. Sharron grabbed the $1,500 in ATF funds, took both Tap's and Yar's cell phones, and left the area on foot. Tap and Yar got out of the ATF vehicle and drove away in their vehicle. Law enforcement followed Sharron for a short distance but decided not to arrest anyone on that day.

Shortly after the robbery, Sharron reconnected with Tap and Yar and gave them the money and the bag with their cell phones inside. Tap persuaded Yar to give Sharron $200 for carrying out the robbery. Yar reminded Sharron that he still owed the drug debt.

At trial, Sharron testified that he had no intention of robbing anyone, but he felt he had no choice but to follow Yar's directions because he was afraid of being shot by Tap or Yar. On cross-examination, Sharron admitted that he left out the details about being threatened by Yar during a proffer interview in May 2019.

Although the court declined to instruct the jury on the "voluntariness" of Sharron's actions when it refused to give a duress or coercion instruction, Sharron

was permitted to argue his theory of defense during closing argument. Sharron's counsel argued intent and reiterated to the jury Sharron's credible fear, explaining that Sharron robbed the CI because he had been "take[n] over and threaten[ed]" and, as a guy who has lived on the streets most of his life and who had been shot previously, Sharron knows when someone "is talking business." Sharron's counsel closed his argument by imploring the jury to find Sharron not guilty because Sharron did not have the intent to commit the robbery since he "was put in an impossible situation where a person in his state of mind, with his knowledge, had no reasonable opportunities to escape." The jury convicted Sharron and he now appeals, arguing the court erroneously failed to instruct on duress and improperly restricted his ability to argue duress to the jury.

## II. DISCUSSION

The district court is obligated to instruct the jury on any recognized defense for which sufficient evidence exists such that a reasonable jury could find in the defendant's favor. United States v. Diaz, 736 F.3d 1143, 1149–50 (8th Cir. 2013) (quoting United States v. Shinn, 681 F.3d 924, 929 (8th Cir. 2012)). "We generally review a district court's refusal to provide a requested instruction for abuse of discretion, but we review *de novo* whether a defendant produced enough evidence to warrant an instruction on an affirmative defense." United States v. Davis, 237 F.3d 942, 945 (8th Cir. 2001).

Sharron proposed three jury instructions that are at issue on appeal. The first one contained undisputed elements of the offense and added additional language allowing the jurors to find Sharron not guilty if they found it was more likely true than not true that Sharron acted under duress or was coerced at the time of the crime. Def. Exh. 104. The second one defined coercion or duress in a manner similar to the Eighth Circuit Model Jury Instructions. Def. Exh. 105; Eighth Circuit Model Crim.

Jury Instr. § 9.02 (2017). The third request embodied a claim that Sharron was entitled to a voluntariness instruction, which stated:

> A criminal must take the form of affirmative conduct such as robbery. However, in order for the act to be considered criminal, it must be voluntary. In order to constitute a voluntary act for which a person may be held criminally liable, the act must result from a person's conscious choice.

Def. Exh. 106.

According to the trial transcript, the proposed instructions were discussed first during an informal jury instructions conference that was not reported. When the court went on the record to address the jury instructions, it appears not all of the previous discussion was made part of the record. For example, the court noted that it thought defense counsel said his proposed instruction on voluntariness came from "various sources," which the court was unable to identify on the record. Regardless of the source(s), the court found the instruction was simply another way of getting at coercion, which it was not going to allow. The court determined that while it would not strike any facts, it had doubts about whether the duress defense applied because the evidence had not established an immediate threat but, at most, a future fear and there were legal alternatives available to Sharron. The court declined to give any of the three requested instructions.

Because all of Sharron's arguments center around the concept of duress, we focus our analysis on that issue. Sharron bears the burden of proving the existence of duress/coercion[2] by a preponderance of the evidence. Dixon v. United States, 548

---

[2]Although the government attempts to distinguish duress from coercion, we have treated these defenses as interchangeable. See United States v. Ross, 969 F.3d 829, 843 (8th Cir. 2020) (listing elements for "duress or coercion"). The commentary to the model criminal jury instructions also note courts have used duress and coercion

U.S. 1, 15–17 (2006). In order to meet this burden, Sharron must show: (1) "an unlawful and present, imminent, and impending threat of such a nature as to induce a well-grounded apprehension of death or serious bodily injury;" (2) that he had not recklessly or negligently placed himself in a situation making it probable that he would be forced to commit a crime; (3) that he "had no reasonable, legal alternative to violating the law;" and (4) a direct causal relationship which can be reasonably anticipated between the commission of the criminal act and avoidance of the threatened harm. United States v. Myles, 962 F.3d 384, 387 (8th Cir. 2020) (citing United States v. Jankowski, 194 F.3d 878, 883 (8th Cir. 1999)).

Sharron's duress defense fails because he did not present sufficient evidence to meet the required elements. "Duress requires more than a 'generalized and speculative fear' of violence." Id. at 388 (quoting United States v. Morales, 684 F.3d 749, 756 (8th Cir. 2012)). Sharron's fear of violence was based on a mere assumption that Tap or Yar had a firearm during the encounters right before and during the robbery, and his belief that Yar might shoot him while he was sitting in the backseat if he did not follow through with the robbery. If Sharron ran away without committing the robbery, Sharron expressed a future fear of harm. He believed "the man would have came looking for me. Like I said, they knew where I stayed at."

Sharron's evidence amounts to a generalized and speculative fear of violence, and is insufficient to demonstrate the requisite showing of a present, imminent, and impending threat. See Ross, 969 F.3d at 844 (requiring "stronger" evidence that defendant attempted to avoid participation and faced "a true imminent threat of death or serious injury that compelled him to assist" in the criminal activity); Morales, 684 F.3d at 756 (coercion defense failed when defendant did not establish the immediacy of the perceived threat but rather feared that in the future the threat might be acted

---

"interchangeably" and treat them as "synonymous." Eighth Circuit Model Crim. Jury Instr. § 9.02, Committee Comments.

on). The district court did not err in declining to give Sharron's proposed instructions because Sharron failed to meet the first element for duress.

Even if Sharron had established a fear that was immediate and well-founded, his duress defense would still fail because he cannot show he had no reasonable, legal alternative to engaging in the robbery. According to Sharron's testimony, he was dropped off by Tap and Yar approximately 50 feet from the meeting location. Once Sharron got out of the car, Tap and Yar drove away to the meeting location. Sharron was left alone behind a building. Yet, Sharron made no attempt to get away from Tap and Yar, to seek help, or to alert authorities about the planned criminal activity that was about to take place. See Myles, 962 F.3d at 388 (finding refusal to report threats to police because of a lack of proof or fear of increased risk of retaliation does not meet the "no reasonable, legal alternative" prong); United States v. Harper, 466 F.3d 634, 648 (8th Cir. 2006) (concluding coercion defense not met when there was "nothing" preventing the defendant from informing law enforcement officials about the alleged threats to the defendant's life or disengaging in the criminal activity).

Although the court ruled that Sharron was not entitled to his requested jury instructions related to duress, during closing argument defense counsel argued, without objection, that Sharron's act of robbing the CI was not voluntary and Sharron lacked the requisite intent to commit the crime. In particular, defense counsel argued to the jury that the robbery was not intended by Sharron and only happened because he had been taken over and threatened by Yar. Counsel tried to bolster Sharron's credibility by arguing that Sharron, as a man who has lived on the streets and who had been shot previously, knows when to take a threat seriously. Defense counsel described Sharron's predicament to the jury as an "impossible situation where a person in his state of mind, with his knowledge, had no reasonable opportunities to escape."

Upon our careful review of the record, we find that the court did not prohibit Sharron from arguing his theory of defense. We further find no abuse of discretion in the court's rulings regarding the parameters of closing argument. See Morales, 684 F.3d at 758 (concluding the court did not abuse its discretion by allowing defense counsel to argue the defendant's actions were involuntary but prohibiting him from arguing the actions were coerced).

## III.  CONCLUSION

We affirm the judgment of the district court.

_____