# United States Court of Appeals
## For the Eighth Circuit

_____

No. 23-2699
_____

United States of America

*Plaintiff - Appellee*

v.

Luis Antonio Flores Atilano

*Defendant - Appellant*
_____

Appeal from United States District Court
for the District of South Dakota - Western
_____

Submitted: March 15, 2024
Filed: May 20, 2024
_____

Before COLLOTON, Chief Judge, ERICKSON and KOBES, Circuit Judges.
_____

ERICKSON, Circuit Judge.

Luis Antonio Flores Atilano was sentenced to 36 months' imprisonment after the district court[1] found him guilty of being an alien in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(5)(A) and 924(a)(8). He contends the government

---

[1]The Honorable Jeffrey L. Viken, United States District Judge for the District of South Dakota, now retired.

failed to prove he knew his presence in the United States was unlawful. In the alternative, he argues the guilty verdict should be overturned because he committed the offense while under duress. We affirm.

## I.    BACKGROUND

On December 1, 2022, law enforcement officers were dispatched to the Motel 6 in Rapid City, South Dakota, following a report from management of an unwanted person in room 259. The room should have been unoccupied, as it had not been rented for that day. The manager accompanied the officer to the room and opened the door with the manager's key. Upon entering the room, they encountered Atilano laying on one of the two beds in the room. Atilano stood up and kept putting his hands in his pockets, contrary to the officer's directions. When the officer asked Atilano if he had any weapons, Atilano gave a response to the officer that had "the effect of no." Atilano consented to a search of his person. After the officer felt bullets in the left front pocket of Atilano's pants, Atilano was handcuffed and informed he was being detained.

The officer then turned his attention to a red backpack situated directly between the two beds in the room. The officer testified that because the room was going to be vacated as being occupied unlawfully, he inventoried the backpack. Inside the backpack were three firearms: (1) a Taurus 9mm handgun with the serial number filed off and a loaded magazine with no rounds in the chamber; (2) an unloaded Stoeger STR9 semiautomatic pistol; and (3) a Smith & Wesson .40 caliber inside a Wahl haircut trimmer case. He also found loose rounds of 9mm and .40 caliber ammunition and a holster with additional rounds of ammunition. Once the firearms were discovered, an additional officer arrived on scene, removed Atilano from the room, and later transported him to jail. Although not charged federally with any drug-related offenses, the officer also observed in plain view a razor with residue, a small scale, and bent tweezers.

With the assistance of an interpreter, law enforcement interviewed Atilano at the jail the next day. Atilano indicated he was born in Mexico and entered the United States in May 2008. He married a United States citizen in 2014. An agent with Immigration and Customs Enforcement ("ICE") informed Atilano that he was in the United States illegally. While there was no record in ICE's database indicating Atilano was granted permission to be in the United States, Atilano insisted that his wife, with the assistance of an attorney, obtained permission for him.

Atilano told law enforcement that he fled Greeley, Colorado, four or five days earlier because he feared for his life. He stated that gang members were looking for him and wanted to kill him. Atilano indicated that he travelled to Rapid City, South Dakota, with a friend who also does roofing work. The friend dropped some items off in Rapid City and left town. Meanwhile, Atilano stayed and would show up to job sites asking to work and be paid in cash. According to Atilano, other workers from Greeley were in town and rented the room at the Motel 6 for a week. When they left town, Atilano went to the hotel and a cleaning person let him into the room. According to Atilano, he was cold so he put on a second pair of pants and a sweatshirt that he found inside the room and proceeded to lay on the bed. A short time later, the door opened and a law enforcement officer entered. Atilano initially denied ownership of the red backpack and the second pair of pants he was wearing, claiming his only possessions were his wallet and a phone.

When the questioning turned to the firearms discovered in the backpack, Atilano repeatedly explained that he was not found with any guns in his hands. When one of the officers mentioned that he would understand if Atilano had guns because he feared for his safety, Atilano admitted he purchased the guns in Rapid City to defend himself. At different times during the interview, Atilano indicated that the sellers told him the guns were "clean." Atilano denied any involvement in a murder that he believed law enforcement was investigating.

During the interview, Atilano relayed to the officers that he was arrested in Greeley, Colorado[2] on August 10 and detectives there told him that if they found him with a weapon again, he would only be ticketed because they knew his life was in danger. When Atilano expressed a desire to get out of jail, an officer explained that he was under arrest and being held in jail because "number one" he was in the United States illegally and "number two" he was a citizen of Mexico without permission to be in the United States so he could not have weapons. Atilano stated that he understood. In response to law enforcement's question about whether Atilano had a license to carry a gun, Atilano admitted that he did not. He stated that he understood it was illegal for him to have a gun in his hand. He expounded on his response stating, according to the government's transcript of the recording, "I didn't have them in my hands because it's illegal. A weapon for a Mexican. It is a, it is a [felony], they said there. Or something, it's very bad." According to the defense's transcript, Atilano responded, "Because it's illegal, you understand me? – I didn't have them in my hands because it's illegal. A weapon for a Mexican it's a – it's a – it's a felony you could say or something severe - -".

Atilano took inconsistent positions during the interview. He initially denied the items found in the hotel room, including the red backpack and the second pair of pants he was wearing that held ammunition in a pocket, belonged to him. He subsequently admitted ownership of at least some of the items. Atilano reiterated throughout the interview that he had the guns available, but not on him, because he feared for his safety. After law enforcement told Atilano to talk to his lawyer and provide the names of the detectives and sheriff in Colorado that were investigating the threats against him, Atilano specifically asked law enforcement if they could help him get political asylum.

On March 2, 2023, the district court held a one-day bench trial on the charge of an alien in possession of a firearm. The government's evidence consisted of four

___

[2]Trial testimony established that Weld County, where Greeley, Colorado is located, is a sanctuary county and thus interaction with law enforcement in Greeley would not likely lead to contact with immigration authorities.

law enforcement witnesses, Atilano's recording with law enforcement, two translated transcripts of the interview, and various other exhibits. A special agent with Homeland Security investigations testified that he located an I-130 application for a visa completed by Atilano's wife in 2014, which was approved in 2015. The form established a spousal relationship and rendered Atilano eligible to petition for a visa. The face of the I-130 application informed the applicant that completion or approval of an I-130 application does not give status in the United States. An immigration officer testified that no additional steps had been taken to complete the process of adjusting Atilano's status to that of a legal permanent resident. The immigration officer also explained that if an alien fears for his safety, the process would be to apply for asylum with the United States Citizenship and Immigration Services. The immigration officer testified that there was no record of Atilano applying for asylum, nor was there any record of him applying for a U visa as a victim of violence while in the United States.

After the government rested, defense counsel moved for judgment of acquittal under Federal Rule of Criminal Procedure 29(a), focusing on the lack of evidence of Atilano's actual knowledge that he was unlawfully in the United States. The district court denied the motion, noting Atilano admitted he entered the United States illegally in 2008 and his reliance on the I-130 form completed by his wife was dubious given it is not an application for asylum or legal status. The defense rested without presenting a case, indicating it would stand by its previous arguments on the lack of evidence to establish knowledge. The government and defense each offered their own written transcriptions of Atilano's recorded interview with law enforcement. Although there were some differences in the transcripts, counsel agreed that they were not material differences. At the close of the evidence, the court took the case under advisement, stating it would review the transcript of the interview provided by defense counsel, it would re-review the transcript provided by the United States, and it may listen to the audiotape of the interview.

During closing argument, the prosecutor argued the evidence establishing Atilano knew he was an illegal alien included: (1) Atilano's own admission that he

entered the United States unlawfully in 2008; (2) his reference to "some paperwork" allowing him to be in the United States but no indication that he ever completed the process to become a lawful resident; and (3) his inquiry with law enforcement about political asylum. In response, defense counsel argued Atilano, relying on the paperwork his wife completed, repeatedly told law enforcement that he believed he was lawfully in the United States and there was no evidence indicating he knew he was supposed to take further action once the I-130 form was approved.

The court reconvened on April 20, 2023. After recounting the evidence presented at trial, the district court found Atilano guilty of being an alien in possession of three firearms and eight rounds of ammunition. It signed and dated the general verdict form that had been previously approved by the parties. No party asked for specific findings. Atilano was subsequently sentenced to a within-Guidelines sentence of 36 months' imprisonment. At sentencing, the court noted that the explanation Atilano gave to law enforcement for why he was in South Dakota, why he was in an unrented hotel room, why he was in fear, and why he had to have the firearms for self-protection "made no sense" and "wasn't convincing."

Atilano appeals, renewing his arguments that the evidence was insufficient to prove beyond a reasonable doubt that he knew he was an alien unlawfully present in the United States and that he was acting under duress at the time of the offense.

## II.    DISCUSSION

When analyzing Atilano's sufficiency of the evidence claim, we apply the same standard we use when reviewing a jury verdict. United States v. Monteer, 83 F.4th 1119, 1122 (8th Cir. 2023). We will uphold the verdict if, after reviewing the evidence in a light most favorable to the verdict, a reasonable factfinder could find the offense was proven beyond a reasonable doubt. Id.

A conviction under 18 U.S.C. § 922(g) has four elements: (1) a status element—here, the defendant knew he was an alien unlawfully in the United States;

(2) a possession element; (3) a jurisdictional element; and (4) a firearm/ammunition element. Rehaif v. United States, 588 U.S. __, 139 S. Ct. 2191, 2195-96 (2019). The only element in dispute here is the first one. Proof of a defendant's knowledge of his status is typically not burdensome since knowledge can be inferred from circumstantial evidence. Id. at 2198 (quoting Staples v. United States, 511 U.S. 600, 615 n.11 (1994)).

The record makes plain that Atilano knew it was unlawful for him to possess a firearm based on the information he relayed about his interactions with the Greeley, Colorado, police officers. If any doubt existed, Atilano removed it during his interview when he indicated he knew it was illegal for him to possess a gun. The narrow dispute before us is whether there is sufficient evidence in the record to prove beyond a reasonable doubt that Atilano knew his presence in the United States was unlawful.

As is reflected in the transcripts, the interview by law enforcement was convoluted. People spoke simultaneously, officers sometimes engaged in discussions among themselves, and translation was difficult at times because of the lack of an equivalent English word. Because of the difficulties with the interview, each side prepared their own transcription. While there are some differences in the transcripts, we agree with the parties that the differences are not material and we find the record contains sufficient evidence for a reasonable factfinder to conclude Atilano knew he was in the United States unlawfully.

Atilano admitted he entered the United States in 2008. When he crossed the border without inspection, he would have been almost 21 years old. Six years later, Atilano was aware that his wife completed some paperwork for his benefit, telling law enforcement that he believed this paperwork allowed him to stay in the United States. Even if he was unaware of the purpose for the I-130 application completed by his wife, he referenced receiving, not a visa or other document granting him permission to be in the United States, but "a sheet of paper" from immigration, which he did not keep in his possession.

Even accepting Atilano's belief that he understood the sheet of paper gave him permission to be in the United States, he acted inconsistent with that belief as the interview progressed. When law enforcement informed Atilano of the reasons for his arrest—he was found in the United States illegally and as a citizen of Mexico without permission to be in the United States he was not allowed to have weapons—Atilano did not contest the reasons provided but instead responded, "I understand." When Atilano was asked whether he knew it was illegal for him to possess a gun, at one point, he stated that he knew it was a serious crime for a Mexican to have a weapon. Atilano argues this statement is evidence of his knowledge regarding whether he can possess a firearm and is not evidence demonstrating his knowledge about his alien status. It is not plain what Atilano meant when he stated he knew it was a crime for a Mexican to possess a firearm. On one hand, as Atilano argues, he might have been referencing a mistaken belief that a Mexican is a prohibited person. On the other hand, it is plausible that Atilano was expressing knowledge that as a citizen of Mexico without permission to be in the United States, he understood that he was prohibited from possessing a firearm. Resolution, however, is not dependent on this particular statement alone. Atilano stated twice during the interview that he wanted to seek asylum and asked law enforcement if they could help him. A reasonable factfinder could conclude that Atilano's desire to seek asylum undermined his earlier expressed belief that he thought he had a lawful right to be in the United States.

"When a defendant's knowledge is at issue, we consider the evidence in its totality and indulge all inferences the fact finder could reasonably have made." United States v. Spencer, 50 F.4th 685, 686-87 (8th Cir. 2022) (cleaned up). Viewing the evidence and drawing reasonable inferences in the light most favorable to the verdict, there is sufficient evidence to establish beyond a reasonable doubt that at the time Atilano was found in possession of firearms and ammunition he knew he was an alien unlawfully in the United States.

Atilano's alternative argument that he satisfied his burden of showing the offense was committed while he was under duress is unavailing. "Duress requires

more than a generalized and speculative fear of violence." <u>United States v. Sharron</u>, 986 F.3d 810, 814 (8th Cir. 2021) (cleaned up). To prove duress, Atilano had the burden of showing by a preponderance of the evidence: (1) an unlawful and present, imminent, and impending threat of such a nature as to induce a well-grounded apprehension of death or serious bodily injury; (2) he had not recklessly or negligently placed himself in a situation making it probable that he would be forced to commit a crime; (3) he had no reasonable, legal alternative to violating the law; and (4) the existence of a direct causal relationship that can reasonably be anticipated between the commission of the criminal act and avoidance of the threatened harm. <u>United States v. Myles</u>, 962 F.3d 384, 387 (8th Cir. 2020).

Atilano's duress defense fails because his evidence consisted of a generalized and speculative fear of violence and he failed to show that he had no reasonable legal alternative to committing the crime. Atilano stated that he fled from Colorado to South Dakota to get away from gang members he believed were trying to kill him. He did not go to the authorities when he arrived in Rapid City, South Dakota. Instead, he went to job sites looking to work for cash and purchased firearms from several different men that he met in a nearby casino. Because Atilano did not present sufficient evidence to satisfy the elements necessary for a duress defense, the district court did not err in rejecting his defense.

## III. CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed.

_____