NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0465n.06

Case Nos. 23-5766/5773

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | **FILED** |
| Plaintiff-Appellee, | ) | Nov 22, 2024 |
| | ) | KELLY L. STEPHENS, Clerk |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| DOUGLAS WILLIAM VANCE (23-5766); | ) | KENTUCKY |
| MOLLY IRENE MCKINNON (23-5773), | ) | |
| | ) | |
| Defendants-Appellants. | ) | OPINION |
| | ) | |

Before: SUTTON, Chief Judge; READLER and BLOOMEKATZ, Circuit Judges.

**CHAD A. READLER, Circuit Judge.** With the aid of millions from outside investors, Douglas Vance and Molly McKinnon ran a "clean coal" company in the heart of Kentucky coal country. Their business, Nex-Gen, purportedly heat-treated biomass and coal and sold the resulting high-energy product to other industrial concerns. In practice, that was not the case. Nex-Gen did little business. Worse yet, fraudulent business records provided to investors hid the company's true financial health. Investors were likewise oblivious as to who had a stake in the enterprise. Nex-Gen's management largely misappropriated and squandered the company's funds. After one of Nex-Gen's employees alerted an investor to the business's troubles, a federal investigation ensued, ultimately leading to a jury finding Vance and McKinnon guilty of an array of fraud and money laundering crimes. On appeal, both attack their convictions and resulting sentences on many a front. We affirm.

**I.**

Douglas Vance, a former coal miner, constructed a calciner, a machine that heats raw biomass or coal to produce biochar or calcinated coal. Such high-energy carbon products can then be sold to energy, industrial, or agricultural companies. From a small operation in Virginia, Vance hoped to expand to a site near Hazard, Kentucky. Enter Molly McKinnon. After meeting Vance in the spring of 2016, McKinnon began working with him, helping Vance with finances, while Vance focused on the business's operations. Vance and McKinnon generally referred to their business as Nex-Gen.

Vance and McKinnon found investors and lenders for Nex-Gen. One investor was Allan Deware. In August 2016, he agreed to provide a quarter million dollars in needed capital, creating a new corporate entity to oversee the operation. Around the same time, Vance and McKinnon convinced a charitable foundation called the Shumard Foundation to similarly invest in Nex-Gen. There were others that put money into Nex-Gen, as well, including Koch Industries and Vance's long-time friend, Joan Faybik.

But not all was what it seemed with Nex-Gen. While the company's investors and lenders each operated on the understanding that they were the exclusive partners with Vance and McKinnon, the reality was that there were many fingers in the Nex-Gen pie. And Nex-Gen never seemed to ship large quantities of processed biomass or coal to any customers, despite continued assurances made to those with a financial stake in the company about pending sales. Indeed, many of the supposed sales and financial records that Nex-Gen's investors and lenders relied on to lend money to Nex-Gen were misleading at best. In truth, Nex-Gen was living hand to mouth. No income was coming into the company, bills were not being paid, and employee paychecks often bounced. The cash the company brought in from investors and lenders was sometimes distributed

back in bits and pieces. But more often it was being misappropriated for personal use, and the company kept operating in a Ponzi-like fashion only because of the infusion of additional cash from unwary investors.

Eventually, the scheme became difficult to conceal. In the spring of 2017, Nex-Gen's office manager, April Francis, noticed sizeable outlays on Nex-Gen's bank statements. Alarmed, Francis turned to McKinnon, who became irate that Francis had examined the bank statement and knew the details of the company's finances. Suspecting that things were not on the up and up, Francis reached out to Deware, who she knew was one of the company's investors, and alerted him to Nex-Gen's financial woes. After reviewing financial documents sent by Francis, Deware realized he was not the only investor in Nex-Gen. He likewise recognized that McKinnon had fabricated documents to hide Nex-Gen's serious financial problems. Deware reached out to federal law enforcement, who, in turn, began investigating Vance and McKinnon in early 2018.

The ensuing investigation unearthed many similar improprieties associated with Vance and McKinnon's business. That led to a grand jury indicting Vance and McKinnon on charges of committing wire fraud, conspiring to commit wire fraud, and conspiring to launder money from August 2016 through December 2018. After a six-day trial in which Vance and McKinnon testified, the jury returned guilty verdicts across the board. The district court sentenced Vance to 174 months and McKinnon to 156 months of imprisonment, respectively.

## II.

**A. 1.** Vance challenges his underlying conviction on two grounds. He first argues that his trial was flawed because the jury never heard about a letter that McKinnon penned more than two years into the scheme that he says exonerates him. Vance never introduced that letter in his case in chief and only pressed the issue in seeking to reopen that phase of the trial. In turn, the district

court denied Vance's request on three grounds: one, Vance failed to adequately explain why the letter was not introduced earlier in the trial; two, the document was not disclosed to prosecutors under the reciprocal disclosure requirements of Fed. R. Crim. P. 16(b)(1)(B)(ii); and three, the letter was impermissible hearsay.

Vance has forfeited the issue on appeal. Vance's opening appellate brief only took aim at the third ground. He never mentioned the first, and his only engagement on the district court's Rule 16 ruling in his opening brief is the bare assertion that an FBI agent was aware of the letter's existence. *See Buetenmiller v. Macomb Cnty. Jail*, 53 F.4th 939, 946 (6th Cir. 2022) (considering "[i]ssues . . . adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation," forfeited (first alteration in original) (citation omitted)). By choosing to do battle on the substantive front while ignoring the process-based reasons for denying his request, Vance has forfeited the issue. *See Glennborough Homeowners Ass'n v. U.S. Postal Serv.*, 21 F.4th 410, 414 (6th Cir. 2021); *see also Blick v. Ann Arbor Pub. Sch. Dist.*, 105 F.4th 868, 884 (6th Cir. 2024).

Against all this, Vance asks that we excuse his opening brief's silence because the excluded evidence would have proved his innocence. True, we can excuse forfeiture to avoid a "miscarriage of justice," *Am. Trim, LLC v. Oracle Corp.*, 383 F.3d 462, 477 (6th Cir. 2004), a phrase that necessarily includes a "plain forfeited error that causes the conviction or sentencing of an actually innocent defendant," *United States v. Olano*, 507 U.S. 725, 736 (1993); *United States v. Andrews*, 681 F.3d 509, 532 (3d Cir. 2012) (comparing excusing forfeiture for failing to raise an issue in an opening brief to plain error review). But even assuming the forfeited arguments for excluding the letter were beyond reasonable dispute or were otherwise a serious affront to the legal system, *see Puckett v. United States*, 556 U.S. 129, 135 (2009); *United States v. Al-Maliki*, 787 F.3d 784, 794 (6th Cir. 2015), the letter itself does not come close to proving Vance "actually innocent." *Olano*,

507 U.S. at 736. Proving as much requires a showing that "no reasonable juror would have convicted him in light of the new evidence." *Schlup v. Delo*, 513 U.S. 298, 327 (1995).

Written well after the Nex-Gen FBI investigation began, McKinnon's letter asserts that Gary Chamblee, the chief investment officer of the Shumard Foundation, forced her to alter Nex-Gen's financial statements, and that Vance "had no knowledge of what Chamblee had told [her] to do." R. 262-1, PageID#2525–30. At bottom, the letter is a suspiciously timed, unsworn statement by McKinnon seeking to lay the groundwork for a duress defense contradicted by the record. Given that a reasonable juror could very well find the letter less than compelling, no miscarriage of justice excuses Vance's forfeiture.

**2.** Vance also contends that the prosecutor's closing comments at trial amounted to a due process violation. (Vance forfeited the argument that the prosecutor also engaged in misconduct during cross-examination because he raised it for the first time in his reply brief. *See Am. Trim, LLC*, 383 F.3d at 477.) Vance would typically face a steep uphill climb to show prosecutorial misconduct based on commentary during summation. We require that any comments, as judged by the whole record, be not just improper, but flagrantly so. *United States v. Gonzalez*, 512 F.3d 285, 292 (6th Cir. 2008). After all, our role is not to screen for inappropriate comments in the government's closing in otherwise fair proceedings. *United States v. Young*, 470 U.S. 1, 11 (1985). Nor do we require prosecutors to deliver sterile closings "devoid of all passion." *United States v. Boyd*, 640 F.3d 657, 670 (6th Cir. 2011) (quotation omitted); *United States v. Henry*, 545 F.3d 367, 377 (6th Cir. 2008) (affording the government "wide latitude" during summation). Yet as Vance never lodged an objection in the district court, his climb is all the steeper. Plain error review in this setting is "doubly deferential," requiring Vance to show that the prosecutor's closing was

"exceptionally flagrant." *Al-Maliki*, 787 F.3d at 795; *Gonzalez*, 512 F.3d at 292 (quotation omitted).

Vance highlights three aspects of the closing that he thinks were exceptionally flagrant. First up are the prosecutor's repeated references to Vance lying. As a general rule, a prosecutor cannot gratuitously comment on a defendant's mendacity devoid of any reference to the record. *See Cristini v. McKee*, 526 F.3d 888, 901–02 (6th Cir. 2008). At the same time, due process is not violated any time prosecutors question a defendant's truthfulness. For "[i]f prosecutors could not question a defendant's credibility, they could never win a case in which the defendant presented an alibi or contradicted the [government's] theory." *Stermer v. Warren*, 959 F.3d 704, 744 (6th Cir. 2020) (Sutton, J., dissenting). The prosecutor's approach here was well within the bounds of propriety. The closing argument cataloged Vance's many misrepresentations throughout the trial and even quoted at length from trial testimony to cast doubt on Vance's truthfulness. That approach was particularly appropriate here since Vance testified. As we have recognized, when a "defendant testifies[,] . . . a prosecutor may attack his credibility to the same extent as any other witness," including by "assert[ing] that a defendant is lying" during closing arguments and by "emphasizing discrepancies between the evidence and that defendant's testimony." *United States v. Francis*, 170 F.3d 546, 551 (6th Cir. 1999); *see also Portuondo v. Agard*, 529 U.S. 61, 69 (2000).

Second up are the prosecutor's more specific comments about Vance's body language and mannerisms. Had the prosecutor been opining on Vance's demeanor outside the witness stand, perhaps such commentary could be out of bounds. *See Cunningham v. Perini*, 655 F.2d 98, 100 (6th Cir. 1981) (per curiam) (recognizing that a defendant's "personal appearance at the trial is irrelevant to the question of his guilt or innocence"). But the prosecutor's remarks concerned Vance's testimony, specifically his eye contact and mumbling during that testimony. Because

Vance "placed his own demeanor in evidence by taking the stand to testify," *id.*, the prosecutor was permitted to highlight how Vance testified, *see United States v. Gooch*, 506 F.3d 1156, 1160–61 (9th Cir. 2007). By commenting on Vance's demeanor on the stand, the prosecutor only emphasized evidence that the jury can consider in determining witness credibility. *See Reagan v. United States*, 157 U.S. 301, 308 (1895); *see also* Pattern Crim. Jury Instr. 6th Cir. 1.07(2)(D) (2023) (instructing the jury to evaluate "how the witness acted while testifying"). We see nothing amiss with the prosecutor doing as much. *See Portuondo*, 529 U.S. at 69.

That leaves Vance's concerns that the prosecutor improperly vouched for April Francis's testimony. Improper vouching can occur when a prosecutor expresses a personal belief that a witness testified credibly, or implies a witness was truthful based on facts not in the record. *United States v. Reynolds*, 86 F.4th 332, 352 (6th Cir. 2023). Vance takes umbrage at the prosecutor referring in summation to the former Nex-Gen employee as "courageous" for becoming a whistleblower. That was not improper vouching. For one, to say Francis was courageous does not suggest her testimony was credible. Courage refers to bravery or lack of fear. It says nothing about whether Francis should be believed, the central concern of improper vouching. *See Francis*, 170 F.3d at 551. And more to the point, the comment was not a naked assertion of the prosecutor's personal opinion. The remark was based on evidence in the specific context of describing what led Francis to reach out to Deware. *See Reynolds*, 86 F.4th at 353 (distinguishing improper vouching from "evidence-rooted arguments" assessing a witness's credibility); *see, e.g.*, *United States v. Birdsong*, 330 F. App'x 573, 578–79 (6th Cir. 2009) (referring to a witness as "brave" for "com[ing] forward" to testify did not imply that the prosecutor "personally believed" the witness or had undisclosed knowledge about the witness's truthfulness). In any event, the prosecutor's isolated comment was insignificant when viewed in the context of the entirety of the

7

trial. *United States v. Wettstain*, 618 F.3d 577, 590 (6th Cir. 2010). All said, the prosecutor's closing statement was not improper, let alone exceptionally flagrantly improper commentary. *Gonzalez*, 512 F.3d at 292.

**B.** Turn then to Vance's arguments that his 174-month sentence was unreasonable. A sentence can be unreasonable based on an errant process used to derive the sentence, as well as simply being off as to its bottom line. *See United States v. Johns*, 65 F.4th 891, 893 (6th Cir. 2023). While Vance contends his sentence was both procedurally and substantively unreasonable, his arguments as to the latter simply echo the former—namely, that the district court erroneously calculated the governing Guidelines range of 151 to 188 months, an issue of procedure. *United States v. Bailey*, 931 F.3d 558, 562 (6th Cir. 2019). So with our focus on the Guidelines calculation, we review preserved challenges to the district court's legal determinations de novo and factual findings for clear error. *Id.* Unpreserved challenges get plain error review, requiring a showing of an obvious error that affected both the defendant's substantial rights and the fairness, integrity, or public reputation of the judicial proceedings. *United States v. Vonner*, 516 F.3d 382, 385–86 (6th Cir. 2008) (en banc). Vance points to four errors with the Guidelines calculation.

**1.** First up is a loss-amount enhancement. Section 2B1.1(b)(1)(I) instructs a district court to increase a defendant's base offense level by 16 for a "loss" exceeding $1,500,000 but less than $3,500,000. *See United States v. Agrawal*, 97 F.4th 421, 436 (6th Cir. 2024). Loss includes "pecuniary harm" that the defendant "knew, or under the circumstances, reasonably should have known . . . was a potential result of the offense." *United States v. Maddux*, 917 F.3d 437, 450 (6th Cir. 2019) (quoting U.S. Sent'g Guidelines Manual § 2B1.1 cmt. n.3(A)(i), (iv) (U.S. Sent'g Comm'n 2024)). The district court here determined a loss amount north of $2.7 million. While the parties debate whether Vance preserved the two fact-bound arguments he makes here, his

challenges to the loss amount cannot survive under the deferential clear-error standard, let alone under plain error review. *See United States v. Riccardi*, 989 F.3d 476, 481 (6th Cir. 2021).

First, Vance says the loss total swept in amounts dating from before he knew about the fraud, which he claims was February 2018. The district court committed no clear error in agreeing with the jury's conclusion that Vance's crimes began well before 2018. Plenty of evidence showed as much. Crediting that evidence, the district court included in the loss calculation amounts that Vance reasonably could have contemplated when he first engaged in the fraud. *Maddux*, 917 F.3d at 450. That Vance had a different story to tell—that he was oblivious to the fraud until 2018— does not move the ball. *See United States v. Guerrero*, 76 F.4th 519, 534 (6th Cir. 2023) ("While [the defendant] argues that these facts could be read in a different way—painting himself as less involved . . . —two different plausible interpretations of the facts does not constitute clear error . . . .").

Second, Vance contends that the district court should not have included roughly $500,000 in loss attributed to Joan Faybik. But any error related to Faybik's inclusion in the loss calculation is at best harmless. Not counting that loss amount would still have resulted in an amount more than $1,500,000, warranting application of the 16-level enhancement. *See United States v. Hills*, 27 F.4th 1155, 1198 (6th Cir. 2022) (concluding that "any error" that does not affect the final range under Guidelines § 2B1.1 is harmless).

**2.** Next Vance challenges the applicability of a two-level "substantial financial hardship" enhancement, an argument he preserved below. That provision is triggered when the underlying offense resulted in such a hardship to at least one victim. U.S. Sent'g Guidelines Manual § 2B1.1(b)(2)(A)(iii) (U.S. Sent'g Comm'n 2015). Gauged by the victim's specific financial circumstances, the loss must be "more than minimal or trivial." *United States v. Skouteris*, 51

F.4th 658, 672 (6th Cir. 2022) (quotation omitted). The district court concluded that Joan Faybik's losses amounted to a substantial financial hardship. And no wonder. A hairdresser and close friend of Vance's, Faybik was an early investor in Nex-Gen who, like others, thought that she was the only other investor (besides Vance) in the company. Faybik provided Vance with whatever money he needed for Nex-Gen, including lending out cash, providing Vance with her personal credit card, and even wiring money from her retirement investment accounts. All told, the FBI investigator estimated that Faybik lent Vance roughly half a million dollars. This resulted in Faybik racking up considerable credit card debt and eating into her retirement savings. On this record, we see no error in the district court concluding that Faybik suffered "more than [a] minimal or trivial" loss. *Id.* (quotation omitted); *see also* U.S. Sent'g Guidelines Manual § 2B1.1 cmt. n.4(F)(iii)–(vi) (U.S. Sent'g Comm'n 2024) (recognizing that losses of retirement funds are relevant considerations in determining a substantial financial loss).

Vance pushes back. He begins by noting that Faybik, in a statement to the district court, claimed that she was not harmed by Vance. But whether Faybik suffered substantial financial hardship is judged by the connection between the offense and the "extent of the harm" that results, *Skouteris*, 51 F.4th at 672 (citation omitted), not by whether she subjectively views herself as harmed, *United States v. Tacke*, 233 F. App'x 649, 651 (9th Cir. 2007); *cf. United States v. Teadt*, 653 F. App'x 421, 428 (6th Cir. 2016). Vance offers another argument, highlighting that FBI agents could trace only $42,500 coming from Faybik to Vance on her bank records alone. But the government offered evidence that Faybik invested much more. The FBI agent investigating Faybik's losses testified that the $42,500 mark was "wildly inaccurate." Faybik herself admitted to the FBI that she provided well more than that amount to Vance. As did her son. So at best, we

are left reviewing the district court's choice between "two different plausible interpretations of the facts," which is not clear error. *Guerrero*, 76 F.4th at 534.

**3.** Vance also challenges the application of a two-level enhancement for committing an offense involving "sophisticated means," an argument he preserved below. U.S. Sent'g Guidelines Manual § 2B1.1(b)(10)(C) (U.S. Sent'g Comm'n 2015). Vance essentially concedes that "sophisticated means" were used to defraud Nex-Gen's investors. Use of false documents and artificial corporate entities to further the fraudulent scheme—the essence of the fraud at issue here—"typically justifies the sophisticated means enhancement." *United States v. Bertram*, 900 F.3d 743, 753 (6th Cir. 2018). But Vance says McKinnon alone brought sophisticated means to bear on the fraudulent scheme.

Two problems plague Vance's position, one factual and one legal. As to the facts, Vance's fingerprints are all over the concededly sophisticated means of the conspiracy. He signed the agreements creating the fraudulent corporate entities that purported to provide exclusive rights in Nex-Gen to both Deware and the Shumard Foundation. And trial testimony detailed Vance's role in providing phony financial records that gave the false impression that Nex-Gen was financially healthy.

As to the law, McKinnon's use of sophisticated means does not absolve Vance of responsibility in this setting. "Where there exists 'jointly undertaken criminal activity,' the base offense level is determined not only by acts committed by the defendant but also 'all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity.'" *United States v. Wilson*, 168 F.3d 916, 922 (6th Cir. 1999) (quoting U.S. Sent'g Guidelines Manual § 1B1.3(a)(1)(B) (U.S. Sent'g Comm'n 2015)); *United States v. Crosgrove*, 637 F.3d 646, 666 (6th Cir. 2011). And it was not clear error for the district court to reject Vance's

11

assertion that he was simply ignorant of McKinnon's mischief and to instead find his ostrich defense incredible. After all, that would have required believing that Vance, who was aware of Nex-Gen's anemic operations, saw nothing amiss when willing investors and lenders continued to pour millions into Nex-Gen's coffers, money which often found its way into Vance's personal bank account. A reasonable alternative to Vance's position was that he was in cahoots with McKinnon, making any means that she undertook to deceive Nex-Gen's investors and lenders reasonably foreseeable to Vance. Here too, Vance seems to be asking us to find clear error based on a simple disagreement as to how to interpret the facts presented to the district court, which we cannot do. *Guerrero*, 76 F.4th at 534.

**4.** Finally, Vance, renewing an argument he made to the district court, challenges the application of a two-point enhancement for abusing a position of trust. That provision contemplates two elements: first, that Vance occupied a position of trust, and second that Vance "abused" that position "in a manner that significantly facilitated the commission . . . of the offense." U.S. Sent'g Guidelines Manual § 3B1.3 (U.S. Sent'g Comm'n 1990); *see United States v. White*, 270 F.3d 356, 371 (6th Cir. 2001). There is little question whether Vance was in a position of trust, which we understand to be one in which the defendant operates with meaningful autonomy or discretion. *See United States v. Hudson*, 491 F.3d 590, 595–96 (6th Cir. 2007). The quintessential example of such a position is an executive of an organization, *see United States v. Humphrey*, 279 F.3d 372, 382 (6th Cir. 2002), which was Vance's role with Nex-Gen. And there is not much debate over whether Vance's role as head of Nex-Gen "significantly facilitated" the underlying crimes here. The fraud that resulted was a direct product of Vance convincing investors, who had little say in or knowledge as to Nex-Gen's specific operations, to rely on him and his clean coal expertise as a trustworthy steward of their investment. *United States v. Brogan*,

238 F.3d 780, 783 (6th Cir. 2001) (recognizing that the sentencing enhancement punishes violating a fiduciary duty, such as "when a person or organization intentionally makes himself or itself vulnerable to someone in a particular position, ceding to the other's presumed better judgment some control over their affairs").

Pointing the finger again at McKinnon, Vance maintains that "no evidence" showed that he exercised control over the victims' property. This is wrong on both the facts and the law. First the facts. Plenty of evidence revealed that Vance exercised control over his victims' finances. Indeed, Vance admitted during cross-examination at trial that he "took" money invested in Nex-Gen to pay off a "personal debt." Then turn to the law. Section 3B1.3's application simply does not hinge on Vance having power over Nex-Gen's finances. Rather, the enhancement requires that Vance's abuse of his position "significantly facilitated" the underlying crimes—that is, the "position of public or private trust must have contributed in some significant way" to make the crimes possible. U.S. Sent'g Guidelines Manual § 3B1.3 cmt. n.1 (U.S. Sent'g Comm'n 2005); *see United States v. Duerson*, 25 F.3d 376, 383 (6th Cir. 1994) (requiring that for § 3B1.3 to apply, the crime need have been "far more difficult . . . to commit" if the defendant had not been in a position of trust). And the record abounds in evidence that without Vance at the helm of Nex-Gen, the underlying fraud simply could not have occurred. In all events, McKinnon's abuse of her position of trust does not absolve Vance, as the Guidelines' relevant-conduct provision governs the position-of-trust enhancement as well, *see United States v. Nance*, 50 F. App'x 295, 297 (6th Cir. 2002), sweeping into Vance's ambit the reasonably foreseeable acts that McKinnon took in her position of trust to facilitate the fraud, *see* U.S. Sent'g Guidelines Manual § 1B1.3(a)(1). Given all of this, we cannot say the district court erred in applying the position-of-trust enhancement to Vance's Guideline calculation.

## III.

**A.1.a.** Like Vance, McKinnon challenges her underlying conviction on two grounds. First, McKinnon argues that the district court, following McKinnon's proffer, erroneously refused to allow her to testify in support of an affirmative defense of duress. We review with fresh eyes whether the district court erred in concluding that McKinnon failed to establish a prima facie case of duress. *United States v. Johnson*, 416 F.3d 464, 468 (6th Cir. 2005). To engage in that review, we first need to set the table as to both the procedure the district court employed in requiring McKinnon to first proffer her testimony, as well as the specifics of that affirmative defense.

Start with the procedure at issue. In line with the Fifth and Sixth Amendment rights to due process and a jury trial, a criminal defendant is entitled to present an affirmative defense like duress that "finds some support in the evidence and in the law." *Id.* at 467 (quotation omitted). To facilitate this presentation, it is incumbent on the trial court to play a gatekeeping role by "limiting evidence in a trial to that directed at the elements of the . . . affirmative defense[]." *United States v. Bailey*, 444 U.S. 394, 416 (1980). Otherwise subjecting the jury to a "potpourri" of evidence that is irrelevant to its ultimate task "wast[es] valuable trial resources" and risks hijacking the jury for alternate, impermissible purposes. *Id.* at 417. To these ends, the district court's gatekeeping role includes requiring the defendant to first proffer evidence that is legally sufficient to support an affirmative defense before presenting to the jury. *United States v. Ridner*, 512 F.3d 846, 849 (6th Cir. 2008); *see also United States v. Capozzi*, 723 F.3d 720, 725 (6th Cir. 2013). To open the gate, "it is essential that the testimony . . . proffered meet a minimum standard as to each element of the defense so that, if a jury finds it to be true, it would support an affirmative defense." *Bailey*, 444 U.S. at 415. That burden is a light one and is met with even weak supporting evidence. *Ridner*, 512 F.3d at 849. So the trial court, to avoid engaging in fact-finding reserved to the jury, must

accept as true the evidence proffered by the defendant. *Lakin v. Stine*, 80 F. App'x 368, 377 (6th Cir. 2003). But when a defendant cannot muster even weak evidence as to each element in the proffer, she cannot present that defense to the jury. *See Johnson*, 416 F.3d at 468.

Turn to the affirmative defense that was the focus of the proffer here. Duress, a concept that dates to the common law, *see* 4 William Blackstone, *Commentaries* \*30, is an affirmative defense excusing a defendant who has engaged in conduct that would otherwise be criminal if the defendant was compelled to do so by threat of an imminent, serious, and unavoidable bodily injury, *see* 2 Wayne R. LaFave, *Substantive Criminal Law* § 9.7 (3d ed. Supp. 2024); 1 Jens David Ohlin, *Wharton's Criminal Law* § 15:7 (16th ed. Supp. 2024). Duress is only available in "rare situations." *United States v. Singleton*, 902 F.2d 471, 472 (6th Cir. 1990). After all, the defense wholly excuses an individual from conduct that plainly "violates the literal language of the criminal law" only because the defendant entirely "lacked a fair opportunity to avoid acting unlawfully." *See* LaFave, *supra,* § 9.7(a) (quotation omitted).

Several elements of a duress defense must be met, all built around the "keystone of the analysis" of whether the defendant could have avoided violating the law, either before or during the crime. *Singleton*, 902 F.2d at 473. A few are of particular relevance here. For instance, the defendant must not have placed herself in a situation where criminal conduct was "probable" in the first place. *Johnson*, 416 F.3d at 468 (quotation omitted). By "getting into the difficulty," the defendant squanders the opportunity to avoid the ultimate criminal act from the get-go. *See* LaFave, *supra,* § 9.7(b). Likewise, the defendant must show there was "no reasonable, legal alternative" to the crime, *Johnson*, 416 F.3d at 468 (quotation omitted), such as alerting law enforcement or disengaging from the criminal enterprise, *see United States v. Sharron*, 986 F.3d 810, 815 (8th Cir. 2021). And the defendant's unlawful conduct must have occurred no "longer

15

than absolutely necessary." *Johnson*, 416 F.3d at 468 (quotation omitted). So when criminal conduct lasts several days or months longer, "it is logical to conclude" that a defendant must have had "ample opportunity" to end the criminality but chose not to. *United States v. Newcomb*, 6 F.3d 1129, 1137 (6th Cir. 1993).

**b.** Consider then McKinnon's proffer. She would have testified that, starting as early as June 16, 2017, Chamblee, the Shumard Foundation's chief investment officer, began demanding that McKinnon alter the bank statements she was sending to another Shumard Foundation employee. In so doing, Chamblee allegedly suggested "bad things could happen" and followed up with text messages containing surreptitiously taken photos of McKinnon. McKinnon thereafter complied with Chamblee's demands. A month passed, and Chamblee, per McKinnon's proffer, asked for more phony bank statements, which McKinnon created and disseminated. Another similar demand was made in September, this time with Chamblee supposedly threatening McKinnon over the phone that he would "punch her in the face." Later that month, an unidentified person mugged McKinnon. McKinnon's misfortunes continued into 2018, with her home burning down that June, and with her being assaulted in a hotel room a few days later. After the mugging, fire, and assault, Chamblee allegedly made comments implying he was involved with each incident. And McKinnon would have testified that later in June 2018, Chamblee "grabbed her by the throat and pushed her against the wall." During this entire saga, McKinnon never contacted law enforcement, apparently relying on her husband's advice that "[y]ou can't trust the FBI."

Accepting what McKinnon proffered as true, we cannot fault the district court for limiting McKinnon's testimony. Gauged by the various elements for duress, McKinnon had ample opportunity to avoid violating the law. *See Singleton*, 902 F.2d at 472–73. Start with the fact McKinnon's criminality began well before Chamblee's pressure started in June 2017. Another

investor, Deware, discovered that McKinnon was falsifying bank records in the spring of 2017. And McKinnon's involvement in the conspiracy dates back several months before that. Those undisputed facts alone show that McKinnon could have avoided her crimes before Chamblee made a single demand on her and that Chamblee's threats were not sufficiently immediate to those criminal acts. *See Johnson*, 416 F.3d at 468; *United States v. Campbell*, 675 F.2d 815, 820 (6th Cir. 1982) (recognizing that the "defense of duress is [un]available" to a person who joins a criminal conspiracy and then later acts out of fear for acts taken in the conspiracy).

Consider that McKinnon's crimes also postdate Chamblee's threats. McKinnon, for instance, was sending false sales numbers to Koch Industries weeks and months after the last threats from Chamblee. But "once the duress ends, so must the criminal behavior, or else the defendant loses the defense." *United States v. Guzman-Cordoba*, 988 F.3d 391, 400 (7th Cir. 2021); *see, e.g.*, *United States v. Austin*, 133 F. App'x 271, 274 (6th Cir. 2005) (denying duress defense because defendant maintained his illegal conduct a full month after the alleged threat and in response to "no new extraordinary threats").

McKinnon's behavior during the height of Chamblee's alleged coercion likewise shows the inappropriateness of a duress defense. During that roughly yearlong period, McKinnon, despite sometimes being located in different states from Chamblee, never went to the police to complain, alerted any coworker (besides Vance through her 2018 letter) of her predicament, nor simply quit her job. *See Sharron*, 986 F.3d at 815. In view of this long time span, we are especially "dubious of the defense" of duress. *United States v. McGee*, 408 F.3d 966, 983 (7th Cir. 2005). Even the best view of McKinnon's proffer shows her behavior before, after, and contemporaneous to Chamblee's alleged coercion was simply incompatible with several elements of duress, justifying the limitation on her testimony.

**c.** McKinnon disagrees many times over. She starts by swinging for the fences, attacking the core procedure the district court used as unconstitutional. Namely, McKinnon argues that a district court can *never* act as a gatekeeper to screen out testimony in support of a hopeless duress defense if the testimony is that of the criminal defendant. Why? McKinnon points to her right "to take the witness stand and to testify in . . . her own defense." *Rock v. Arkansas*, 483 U.S. 44, 49 (1987). But that right is not "unfettered." *Taylor v. Illinois*, 484 U.S. 400, 410 (1988). Indeed, the guarantee concerns her "right to present *relevant* testimony." *See Rock*, 483 U.S. at 55 (emphasis added). So a district court may, consistent with the Constitution, exclude McKinnon's own testimony, so long as it is done through the proper application of nonarbitrary evidentiary rules, such as those "familiar and unquestionably constitutional" evidentiary rules that permit a trial judge to exclude irrelevant evidence. *Holmes v. South Carolina*, 547 U.S. 319, 326–27 (2006) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 42 (1996) (plurality opinion)); *United States v. Moreno*, 102 F.3d 994, 999 (9th Cir. 1996) ("While the constitutional right to testify permits a defendant to choose whether or not to take the witness stand, it does not authorize a defendant to present irrelevant testimony."). And that is just what happened here: McKinnon proffered testimony that could not satisfy several elements of duress, making that particular testimony not relevant as a matter of law and justifying the district court's exclusion of that evidence from the trial. *See Moreno*, 102 F.3d at 998–99 (upholding exclusion of defendant's testimony that insufficiently established a duress defense); *United States v. Bifield,* 702 F.2d 342, 350 (2d Cir. 1983) (same); *United States v. Graham*, 663 F. App'x 622, 627 (10th Cir. 2016) (order) (same).

Taking a different tack, McKinnon argues the customary elements for a duress claim that we rely on here are limited to the context of firearm possession cases. True, the so-called *Singleton* factors have their genesis in the context of a gun possession case. *Singleton*, 902 F.2d at 472–73.

But we have never limited their application to that setting. *See United States v. Hopkins*, 151 F. App'x 448, 454 (6th Cir. 2005) (per curiam) (recognizing that, "[a]lthough *Singleton* involved a case of a felon's firearm possession," we have applied the test in many other contexts). Nor would we. The various factors we have traditionally used to evaluate a duress defense gauge whether the defendant could have avoided violating the law. *See Singleton*, 902 F.2d at 473. Extending beyond the firearm possession context, this notion reflects the common law origins of a duress defense, which concerned excusing criminal conduct compelled by an imminent, serious, and unavoidable threat. *See* LaFave, *supra,* § 9.7; Ohlin, *supra*, § 15:7. As Congress legislated against those background principles when they enacted the various fraud statutes that undergird McKinnon's convictions, *Dixon v. United States*, 548 U.S. 1, 19 (2006) (Alito, J., concurring); *Bailey*, 444 U.S. at 415 n.11, it is appropriate to consider those elements here, *see, e.g.*, *United States v. Milligan*, 17 F.3d 177, 181 (6th Cir. 1994) (applying the *Singleton* factors with respect to mail and wire fraud convictions).

Accepting *Singleton*, McKinnon next argues that her proffer satisfied that framework. McKinnon first points to her testimony about her husband's advice to not trust the FBI and her resulting fear of contacting law enforcement. But a vague and subjective fear that going to law enforcement would be futile or counterproductive is simply insufficient to establish a prima facie case of duress. *See United States v. Myles*, 962 F.3d 384, 388 (8th Cir. 2020); *United States v. Harris*, 7 F.4th 1276, 1293 (11th Cir. 2021) (collecting cases establishing that an "objective standard" governs whether defendant had a "reasonable alternative to committing the crime"). And even if McKinnon had more robustly supported her fear of the police, she explored no other avenue to disengage from the criminal conspiracy during its two-year course. *See McGee*, 408 F.3d at 983. McKinnon's letter to Vance, which she claims she "hope[d]" would be presented to

19

the FBI, does not move the needle either. The letter was written in November 2018, well over two years into McKinnon's criminal activity. That hardly shows an expeditious effort by McKinnon to extricate herself from the situation. *See Johnson*, 416 F.3d at 468 (requiring that defendant not maintain the illegal conduct any longer than absolutely necessary). McKinnon's evidence in support of several of the elements of duress, in other words, was not just weak or lacking in credibility (which could go to the jury); it was non-existent.

McKinnon next argues that even if her testimony were irrelevant as to the duress defense, it was still relevant to whether she had the underlying state of mind to commit wire fraud. That state of mind requires her to have knowingly made a material misrepresentation or omission with the "purpose of inducing the victim of the fraud to part with property or undertake some action that [the victim] would not otherwise do absent the misrepresentation or omission." *United States v. Robinson*, 99 F.4th 344, 357 (6th Cir. 2024) (quotation omitted). McKinnon argues that her "purpose" in committing wire fraud was for self-preservation, not to induce the victims to take any action.

Two problems with McKinnon's position deserve mention. First, the district court never limited McKinnon's testimony from touching on her state of mind; instead, the district court simply prevented McKinnon from testifying about the specific defense of duress. That makes sense, especially because McKinnon sought to introduce evidence of Chamblee's coercion only to support a duress defense. When McKinnon did testify, she seemed to call an audible from her original position that she was pressured into committing fraud at the behest of Chamblee. While she certainly was allowed to testify about her state of mind, her testimony adopted the position that she was simply clueless as to what Chamblee was up to and that she merely passed along fraudulent information that Chamblee sent her. The trial court never limited McKinnon's

testimony on account of the earlier ruling on the duress limitation. So we fail to see how the district court erred when it never issued a ruling on this issue. *See United States v. Alvear*, 181 F. App'x 778, 781 (11th Cir. 2006) (per curiam) (refusing to consider argument that a duress defense could also be used to negate an element of the crime when never raised below).

Second, and more fundamentally, McKinnon conflates a duress defense with the state of mind element of a crime. Duress "does not negate a defendant's criminal state of mind," but "allows the defendant to 'avoid liability . . . because coercive conditions or necessity negates a conclusion of guilt even though the necessary *mens rea* was present.'" *Dixon*, 548 U.S. at 7 (alteration in original) (quoting *Bailey*, 444 U.S. at 402). Thus, taking McKinnon's allegations as true, when she complied with Chamblee's coercion by defrauding investors, she still acted with the purpose of committing fraud. In other words, McKinnon acted purposefully in committing wire fraud even if she committed those acts only to appease Chamblee. *See United States v. Leal-Cruz,* 431 F.3d 667, 671–72 (9th Cir. 2005) (recognizing that a duress defense does not negate specific intent crimes); *United States v. Wall*, 593 F. App'x 128, 131 (3d Cir. 2014) (holding that duress defense does not negate purposeful state of mind for fraud). Any alternative view would flip the burden of disproving duress, contrary to the presumed intent of Congress. *See Dixon*, 548 U.S. at 17.

Finally, McKinnon contends that the government "opened the door" for her to testify about Chamblee's threats. On direct examination during their case in chief, the government did indeed ask Chamblee whether he had ever threatened McKinnon, which Chamblee denied. But the government did not initiate the topic. McKinnon did so by raising the issue of duress in her opening statement. McKinnon cites no authority to suggest that the government, by asking questions that might be relevant to a potential defense in its case in chief, necessarily allows for

evidence to be later introduced on an otherwise futile defense. And even assuming the government initiated the duress discussion, "[w]hen a party opens the door to a topic, the admission of rebuttal evidence on that topic" merely "becomes permissible"; it does not become mandatory. *Tanberg v. Sholtis*, 401 F.3d 1151, 1166 (10th Cir. 2005). We see no error in the district court, with the door having been cracked open, refusing to allow the door to be kicked wide open with further irrelevant testimony.

**2.** McKinnon also argues that insufficient evidence supported her conviction. But overturning a jury verdict is no easy feat. Our review is limited to considering whether, after construing all the evidence in a light most favorable to the government, the jury "behaved irrationally in concluding beyond a reasonable doubt that" McKinnon committed the charged crimes. *United States v. Miller*, 982 F.3d 412, 440 (6th Cir. 2020). McKinnon makes two general sufficiency arguments.

**a.** She first challenges her wire fraud convictions as to the state of mind element—i.e., knowingly using an interstate wire communication to further a scheme to defraud Nex-Gen investors and lenders of their money. *See United States v. Faulkenberry*, 614 F.3d 573, 581 (6th Cir. 2010). That is a particularly daunting task, given our repeated guidance that determinations about criminal intent "should not be lightly overturned." *Robinson*, 99 F.4th at 357 (quoting *United States v. Daniel*, 329 F.3d 480, 487 (6th Cir. 2003)). McKinnon falls short on this front. Overwhelming evidence showed she had the requisite intent.

Start with April Francis's testimony. She told the jury that upon disclosing to her boss suspicious and sizeable outlays from Nex-Gen's bank account, McKinnon, instead of responding with equal concern, became irate. This reasonably suggested to Francis that McKinnon "did not want anybody else seeing any of the financial details of what's coming in and what's going out,"

R. 174, PageID#755, suspicious behavior consistent with an intent to commit fraud, *see Daniel*, 329 F.3d at 488. And then consider the seemingly endless falsities that McKinnon pressed upon Nex-Gen's investors and lenders that resulted in them forking over money to the company. McKinnon, who referred to herself as the chief financial officer for Nex-Gen, took part in the setup of supposedly exclusive agreements with both Deware and the Shumard Foundation. She also sent phony and incomplete financial records to Deware, the Shumard Foundation, and Koch Industries. This pattern of extensive misrepresentations well supports an inference of an intent to defraud. *See Robinson*, 99 F.4th at 357–58. Perhaps most damning, McKinnon, while being cross examined by the government at trial, admitted that she knew she was falsifying the bank statements that she sent to the Shumard Foundation's accountant, which likewise suffices to support an inference of willfulness. *See Skouteris*, 51 F.4th at 669 (recognizing that proof of knowledge can give rise to a reasonable inference that defendant acted purposely).

In response, McKinnon offers several arguments, all of which essentially ask us to revisit how the jury weighed the evidence. For instance, she claims Francis had an "axe to grind" with Vance and McKinnon and should not have been believed. But it is the jury's job, not ours, to make credibility determinations. *See United States v. Hinojosa*, 67 F.4th 334, 341 (6th Cir. 2023). McKinnon also criticizes the government for relying on circumstantial evidence to prove intent. But direct proof of fraudulent intent is available only in rare cases, *United States v. Washington*, 715 F.3d 975, 980 (6th Cir. 2013), and we do not question the sufficiency of evidence in support of a criminal conviction simply because it is circumstantial, *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003). McKinnon otherwise asks us to reevaluate the evidence presented to the jury and accept her counter-explanations for the various misrepresentations that she provided to Nex-Gen investors and lenders. That likewise is a nonstarter, as we cannot reweigh the evidence or

otherwise substitute our judgment for that of the jury on a sufficiency challenge. *United States v. Martinez*, 430 F.3d 317, 330 (6th Cir. 2005).

**b.** McKinnon also challenges her convictions for conspiring to commit wire fraud and money laundering. As to the former, the government needed to show a knowing agreement to further the fraud. 18 U.S.C. § 1349; *United States v. Rogers*, 769 F.3d 372, 377 (6th Cir. 2014). As to the latter, the government needed to show that McKinnon knowingly agreed to undertake a "financial transaction" involving the proceeds of some unlawful activity to promote or conceal that activity. *See United States v. Matthews*, 31 F.4th 436, 447 (6th Cir. 2022) (quotation omitted).

There was plenty of evidence of an agreement between McKinnon and Vance to commit wire fraud and money laundering. Indeed, they worked together like hand in glove in running Nex-Gen. One employee of Koch Industries, for instance, testified how it was the "combination" of McKinnon and Vance that drove Koch's investment in the clean coal company. And with their hands on Nex-Gen's helm, countless incidents of wire fraud occurred. As one example, the jury saw emails from McKinnon to Vance, to which McKinnon attached phony sales sheets from a company whose logo she "used" from their website. Hours later Vance would send those same documents along to persuade a lender to continue supporting the supposedly healthy enterprise. *See Faulkenberry*, 614 F.3d at 582 (describing wire fraud scheme using email to send falsified financial records to lull investors into a sense of security). The scheme also included money laundering. McKinnon and Vance would send bits and pieces of the proceeds of their fraud to their investors and lenders, having them think they were receiving proceeds of Nex-Gen's sales to continue with their investments. *See United States v. Warshak*, 631 F.3d 266, 317 (6th Cir. 2010) (discussing the "paradigmatic example" of money laundering being "a drug dealer using the proceeds of a drug transaction to purchase additional drugs and consummate future sales").

24

Against all of this, McKinnon simply argues that the jury should have believed her testimony that she acted at the behest of Chamblee, leaving Vance in the dark. But it is for the jury, not us, to sort out conflicting evidence. *See Martinez*, 430 F.3d at 330. With sufficient evidence to support the various conspiracy charges, McKinnon's convictions must stand.

**B.** All that remains are McKinnon's challenges to her 156-month sentence, which was based off an advisory range of 135 to 168 months. She challenges the sentence on procedural and substantive reasonableness grounds.

**1.** Like Vance, McKinnon challenges the application of a 16-point loss-amount enhancement under Guidelines § 2B1.1(b)(1). Recall that loss includes any "pecuniary harm" that the defendant "knew, or under the circumstances, reasonably should have known . . . was a potential result of the offense." *Maddux*, 917 F.3d at 450 (quotation omitted). As with Vance, the district court thought McKinnon reasonably should have known that roughly $2.7 million of actual loss could result. McKinnon attacks several line items included in that figure. We only need to confront the $605,000 loss amount attributed to Koch Industries. Because McKinnon did not adequately challenge the $605,000 loss amount below, she must show plain error. *See United States v. Huntington Nat'l Bank*, 574 F.3d 329, 332 (6th Cir. 2009) (holding that an issue is preserved if a litigant "state[s] the issue with sufficient clarity to give the court and opposing parties notice that it is asserting the issue" and "provide[s] some minimal level of argumentation in support of it").

The record amply supports the loss finding as to Koch Industries. The $605,000 amount stems from a 2018 loan agreement between Nex-Gen and Koch. Koch lent the money to Nex-Gen for use as working capital to help run the business. But to obtain the loan, McKinnon and Vance failed to disclose the other players who had a financial stake in the company, falsely suggested

that Nex-Gen was financially healthy, and even sent fraudulent customer lists and sales records to Koch. And per testimony from a Koch employee, Koch relied on McKinnon's and Vance's omissions and misrepresentations to lend the $605,000. The money was never returned to Koch and was spent on Vance's personal debts. Against this backdrop, McKinnon argues that the "weight of the evidence" shows Koch's loans predated the fraud or would still have been issued. But we do not reweigh evidence on clear error review, let alone on plain error review. *United States v. Reid*, 357 F.3d 574, 582 (6th Cir. 2004). And including that $605,000 amount and excluding other challenged amounts still puts the total north of the $1.5 million mark needed to justify the 16-point enhancement. *See Hills*, 27 F.4th at 1198. On this record, McKinnon falls well short of showing an obvious or egregious error demanding revision of that loss amount.

**2.** Next, McKinnon challenges her two-point enhancement under Guidelines § 3C1.1. That provision governs a defendant who "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the . . . prosecution . . . of" the charged offense. U.S. Sent'g Guidelines Manual § 3C1.1 (U.S. Sent'g Comm'n 2011). The probation department proposed this enhancement because McKinnon falsely testified at trial. Specifically, she denied that she served as the chief financial officer of Nex-Gen, altered Nex-Gen's financial records for investors, and failed to disclose accurate information to investors. McKinnon never challenged this recommendation, and the district court applied it without objection. Plain error therefore governs McKinnon's challenge on appeal. *See Vonner*, 516 F.3d at 385–86.

No plain error occurred. McKinnon does not challenge the probation department's assessment that she lied during her testimony. And perjury is quintessential conduct warranting application of the obstruction enhancement. U.S. Sent'g Guidelines Manual § 3C1.1 cmt. n.4(B) (U.S. Sent'g Comm'n 2023). Instead, McKinnon points to the district court's passing comment

that the proposed duress testimony warranted application of § 3C1.1. As McKinnon sees it, the enhancement does not cover testimony that she tried to give but ultimately did not render. But the enhancement plainly applies to *attempts* to obstruct justice. *See id.* § 3C1.1. And in any event, McKinnon's failure to rebut the probation department's finding that she otherwise lied about material matters during her trial testimony renders any supposed error by the district court harmless. *See United States v. Chychula*, 757 F.3d 615, 621 (7th Cir. 2014).

**3.** Like Vance, McKinnon also challenges the application of the two-level substantial financial hardship enhancement with regard to Faybik's losses. McKinnon preserved this argument below, meaning we review any legal questions de novo and factual findings for clear error. *See Bailey*, 931 F.3d at 562. Beyond Vance's reasons for not applying the substantial financial hardship enhancement that we have already rejected, McKinnon contends that she lacked any awareness as to Faybik's involvement in Nex-Gen, making her not responsible for Faybik's substantial financial hardship.

We see two problems for McKinnon. First, the enhancement covers Vance's conduct as well, so long as Vance's acts were "reasonably foreseeable" to McKinnon "in connection with" their jointly undertaken criminal activity. U.S. Sent'g Guidelines Manual § 1B1.3(a)(1). And McKinnon takes no issue, nor do we see any concern, with the district court's finding that it was "reasonably foreseeable" that Vance's conduct undertaken in support of the fraud could result in a substantial financial hardship for the scheme's victims. Second, record evidence suggests that McKinnon engaged in fraudulent activity with the full knowledge of who Faybik was. For example, McKinnon conceded on cross-examination that she knew that Vance was "self-funding" Nex-Gen from people like Faybik, who McKinnon understood to be a "personal friend" of Vance's. And Deware testified that McKinnon doctored financial records to remove Faybik's

involvement from other investors, suggesting that McKinnon was well aware of Faybik at the time of the fraud. At best, then, McKinnon simply disagrees with how the district court credited these facts in the face of her own denials. But that cannot be the basis for a clear error finding. *See Guerrero*, 76 F.4th at 534.

Relatedly, McKinnon argues that she qualified for a reduction under Guidelines § 4C1.1(a), as a zero-point offender who did not "personally cause substantial financial hardship." But we need not resolve the substance of McKinnon's argument. Section 4C1.1(a) did not go into effect until November 1, 2023, *see* U.S. Sent'g Guidelines Manual app. C, amend. 821, pt. B, subpart 1 (U.S. Sent'g Comm'n 2023), over two months after McKinnon's sentencing, *see id.* § 1B1.11(a) (U.S. Sent'g Comm'n 1992) ("The court shall use the Guidelines Manual in effect on the date that the defendant is sentenced."); *Huff v. United States*, 734 F.3d 600, 608 (6th Cir. 2013). The current sentence is therefore not erroneous because it was "properly imposed based on the guidelines in effect at the time of sentencing." *United States v. Ursery*, 109 F.3d 1129, 1137 (6th Cir. 1997) (suggesting an 18 U.S.C. § 3582(c)(2) motion is the appropriate vehicle to pursue retroactive application of an amendment to the Guidelines).

**4.** That leaves McKinnon's substantive reasonableness challenge. District courts generally enjoy wide latitude when crafting a sentence, *see Concepcion v. United States*, 597 U.S. 481, 486 (2022), with the central guardrails on the process being the mandatory sentencing factors in 18 U.S.C. § 3553(a). By comparison, our substantive review of the sentence the district court issued is much more constrained. We simply consider whether the sentencing court gave reasonable weight to the various § 3553(a) factors to arrive at a sentence that is neither "too long" nor "too short." *United States v. Parrish*, 915 F.3d 1043, 1047 (6th Cir. 2019); *United States v. Rayyan*, 885 F.3d 436, 442 (6th Cir. 2018). In so doing, we do not moonlight as a district court. Respecting

the primacy of that court, "[w]ith its front row seat at sentencing proceedings," we afford its decision considerable deference. *See United States v. Hymes*, 19 F.4th 928, 936 (6th Cir. 2021) (alteration in original). Especially so when the sentence, as was the case here, fell within the Guidelines range, making the sentence presumptively reasonable. *See United States v. Simmons*, 587 F.3d 348, 365 (6th Cir. 2009). Reversal is warranted only where we are left with the "definite and firm conviction that the district court committed a clear error of judgment" as to the length of a sentence. *Hymes*, 19 F.4th at 933 (quotation omitted).

Here, the district court thoughtfully considered the various § 3553(a) factors, including the nature of the offense, the history and characteristics of the defendant, the need for specific and general deterrence, and McKinnon's rehabilitative needs. The sentencing court emphasized the "very serious" nature of McKinnon's offenses, including that "significant losses" resulting from the fraud. At the same time, the district court reflected on McKinnon's personal history and characteristics, including her childhood and current physical and mental state. The sentencing court likewise reflected on rehabilitation concerns, as well as the risk of an unwarranted sentencing disparity among similar defendants. Balancing those concerns against each other, the district court arrived at a total sentence of 156 months' imprisonment. We lack any "definite and firm conviction" that the district court erred with its end sentence, *id.* at 933 (quotation omitted), to overcome the presumptive reasonableness we afford a within-Guidelines sentence, *Simmons*, 587 F.3d at 365.

McKinnon pushes back. Pointing to data from the United States Sentencing Commission, she contends her sentence is out of step with that of others similarly situated. Our precedent forecloses such an argument. *See Hymes*, 19 F.4th at 935–38 (rejecting procedural and substantive reasonableness challenges based on Commission data). And for good reason. The argument picks

29

out one of the § 3553(a) factors, unwarranted sentencing disparity, and tries to suggest, with the aid of Commission statistics, that a sentence grounded in an appropriate Guidelines range promotes such a disparity. But the Guidelines are carefully crafted to do just the opposite. *Id.* at 936. So given the choice between raw data from the Commission or the Guidelines, the latter is our "barometer for promoting nationwide sentencing uniformity." *Id.* (quotation omitted). And there is certainly no error in the district court, in exercising its broad discretion in determining which sentencing disparities are unwarranted, to rely on the Guidelines to inform its decisionmaking. *Id.* at 935. In any event, preventing sentencing disparities is not the only goal in sentencing. So a district court exercising its discretion to emphasize other appropriate sentencing factors does not, on its own accord, amount to an abuse of discretion. *Id.* at 937; *United States v. Ely*, 468 F.3d 399, 404 (6th Cir. 2006) (holding that an argument that the district court should have balanced the § 3553(a) factors differently is "beyond the scope of [this Court's] appellate review").

The sentencing data McKinnon proffers is not compelling on its own terms. The data encompasses all offenders with a minimal criminal history who were sentenced primarily under Guidelines § 2B1.1. But that, of course, lumps McKinnon in with a number of dissimilar defendants. For instance, § 2B1.1 covers a range of offenders, from those whose crimes result in a loss of only a few thousand dollars to defendants like McKinnon whose offenses resulted in victims losing millions of dollars. For these reasons, we have often viewed Commission data like this as unhelpful to district and circuit courts alike, as the data "does not necessarily illuminate the differences among offenders." *United States v. Axline*, 93 F.4th 1002, 1013 (6th Cir. 2024). Given this, we cannot say the district court's weighing of the § 3553(a) factors was off here.

## IV.

For the aforementioned reasons, we affirm the judgments of the district court.